UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                       )
IRENE CAPPALLI, individually and       )
on behalf of all others similarly      )
situated,                              )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )    C.A. No. 10-407 S
                                       )
BJ'S WHOLESALE CLUB,INC.,              )
                                       )
          Defendant.                   )
_____)
```

**ORDER**

WILLIAM E. SMITH, United States District Judge.

Plaintiff Irene Cappalli filed this putative class action against Defendant BJ's Wholesale Club, Inc. ("BJ's"), alleging breach of contract and, in the alternative, an equitable claim of money had and received.

I.  Facts

The following facts are undisputed unless otherwise noted. BJ's is a corporation that owns and operates warehouse club stores.  BJ's offers twelve-month memberships for a fee.[1]  In exchange for payment of the membership fee, members are provided the opportunity to purchase merchandise from BJ's stores at

_____

[1] Between 2006 and 2010, the annual membership fee was $45 for "Inner Circle" members, like Cappalli.  (Def.'s Statement of Undisputed Facts ("Def.'s SUF") ¶ 4, ECF No. 47.)

ostensibly low prices.  While non-members are permitted to shop at BJ's stores, their purchases are generally subject to a 15% surcharge.  (Def.'s Statement of Undisputed Facts ("Def.'s SUF") ¶¶ 32-33, ECF No. 47.)  At the expiration of their memberships, members are given a fifteen-day "grace period" during which they may make purchases at BJ's stores without paying any surcharge.  (Atkinson Aff. ¶ 13, ECF No. 45.)  BJ's policy concerning renewal memberships is the basis of this suit.

Cappalli became a BJ's member on November 11, 2005 through a free sixty-day trial membership.  (Def.'s SUF ¶ 12C.)[2]  Because BJ's extends membership expiration dates until the last day of the month in which membership expires, Cappalli's trial membership expired on January 31, 2006.  (Id. at ¶¶ 13C-14C.) Cappalli purchased renewal memberships at the membership desk of the BJ's store in Coventry, Rhode Island on March 26, 2006, February 15, 2007, February 2, 2008, and February 12, 2009. (Ex. D to Atkinson Aff., ECF No. 45-4.)  Each of these renewal memberships expired the following January 31.  Cappalli renewed her BJ's membership for the final time on February 27, 2010. (Id.)  This time, Cappalli made her purchase online.  (Def.'s SUF ¶ 25.)  Cappalli received a printed confirmation indicating

---

[2] In its Statement of Undisputed Facts, BJ's used paragraph numbers twelve through fourteen in section B and repeated those same paragraph numbers in section C.  For this reason, when referring to the paragraphs in section C with duplicated numbers, this Court has included a "C."

that her membership would expire in "01/2011."[3]   (Ex. B to Renshaw Aff., ECF No. 46-3.)  Cappalli never made any purchases between the expiration of her prior membership and her purchase of a renewal membership, and, thus, she never paid a surcharge at BJ's.  (Def.'s SUF ¶ 36.)

When Cappalli joined BJ's in 2005, BJ's "Core Membership Privileges and Conditions" ("P&C's") provided, "[m]embers who renew their Memberships during their expiration month, or within three (3) months after the expiration month, will retain their current expiration month for the renewed year.  Memberships renewed more than three (3) months after their original expiration date are subject to new Membership expiration dates at BJ's discretion" ("renewal policy").  (Ex. A to Atkinson Aff., ECF No. 45-1.)  Because Cappalli renewed her membership in March 2006, less than three months after the expiration of her prior membership, she retained her prior expiration date of

---

[3] BJ's contends that Cappalli "consulted" with an attorney concerning her BJ's membership in August 2009, before she purchased her last renewal membership.  (Def.'s SUF ¶¶ 24, 30.) Cappalli counters that, in her response to Defendant's interrogatories, she merely stated that she "spoke" to an attorney who she was working for at the time.  (Pl.'s Statement of Disputed Facts ("Pl.'s SDF") ¶ 30, ECF No. 56; Ex. B to Renshaw Aff., ECF No. 46-7.)  There is a genuine dispute concerning the extent of Cappalli's interactions with the attorney and, thus, whether those interactions indicate her knowledge of BJ's renewal policy.  For this reason, the Court will not consider Cappalli's meeting with the attorney in ruling on the parties' motions.  See Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009).

January 31.   In April 2008, BJ's shortened its renewal policy from three months to one month.   (Def.'s SUF ¶ 10.)   Also at this time, BJ's revised its P&C's to omit the description of its renewal policy.   (Ex. B to Atkinson Aff., ECF No. 45-2.)   In September 2010, BJ's adopted a two-month renewal policy and revised its P&C's to include a description of that policy.   (Ex. C to Atkinson Aff., ECF No. 45-3.)   All three iterations of the P&C's, in a separate section drawing no distinction between initial and renewal memberships, provided, "[m]embership is effective for one year from enrollment."   (Exs. A-C to Atkinson Aff.)   Throughout Cappalli's membership, BJ's membership desk personnel were instructed to provide a copy of the P&C's to anyone who purchased a membership.   (Def.'s SUF ¶ 8.)

    BJ's members are not required to sign any form indicating their agreement to the P&C's.   (Pl.'s Separate Statement of Undisputed Facts ("Pl.'s SSUF") ¶ 60, ECF No. 55.)   In fact, BJ's does not require its members to assent to BJ's membership renewal policy in any written agreement.   (Def.'s Resp. to Pl.'s Separate Statement of Additional Undisputed Facts ("Def.'s Resp.") ¶ 61, ECF No. 63.)

    Between April 2008 and August 2010, when BJ's renewal policy was not reflected in its P&C's, BJ's provided information about its renewal policy in the "Frequently Asked Questions" section of its website.   (Ex. E to Atkinson Aff., ECF No. 45-5.)

4

The website stated that "[a]ll new BJ's Memberships are valid for 12 months from the date of activation, <u>unless otherwise indicated</u>." (<u>Id.</u> (emphasis added).)  It went on to explain BJ's renewal policy in a manner similar to the P&C's.  There is, however, no evidence in the record that BJ's directed renewing members to this portion of its website to find the terms of their membership agreements.

It is BJ's stated practice to provide every member who renews at the membership desk of a BJ's store a printed receipt showing the expiration date of the renewal membership.  (Def.'s SUF ¶ 17.)  When Cappalli purchased her renewal membership on February 15, 2007, she received a receipt that stated, "MEMBERSHIP EXPIRES ON 01/08."  (Ex. B. to Renshaw Aff., ECF No. 46-4.)   Similarly, when Cappalli purchased her renewal membership on February 12, 2009, she received a receipt that stated, "MEMBERSHIP EXPIRES ON 01/10."  (Ex. B. to Renshaw Aff., ECF No. 46-5.)

It is also BJ's practice to provide members with a receipt showing their membership expiration date whenever they make a purchase in a BJ's store.  (Def.'s SUF ¶ 18.)  Cappalli shopped at BJ's stores on 46 occasions between November 2005 and January 2011.[4]  (<u>Id.</u> at ¶ 34.)

_____

[4]  In her deposition testimony, Cappalli acknowledged that she received a receipt every time she shopped at BJ's, but she

Additionally, it is BJ's practice to send a renewal notice to members during the month that their memberships are due to expire and to send a second notice after their memberships have expired.  (Id. at ¶ 22.)  Cappalli received a renewal notice from BJ's in early 2007.  This notice stated that Cappalli's "Membership Expired" in January 2007 and encouraged her to "[r]enew for a year right now."  (Ex. A to Woodward Aff. 49-50, ECF No. 54-1.)  The notice listed Cappalli's "Renewal Date" as January 2007.  (Id.)  It also stated, "Inner Circle and Business Membership Privileges and Conditions are available at any BJ's Member Services Desk or online at www.bjs.com."  (Id.)

Cappalli testified at her deposition that, when she renewed her BJ's membership, she expected the renewal membership to expire twelve months from the date of purchase.  (Ex. B to Renshaw Aff. (Cappalli Dep. 128:15-18), ECF No. 46-2.)  However, Cappalli also testified that she could not recall the basis of this belief and referred to it as "an assumption."  (Id. at 128:3-12, 128:23-129:2.)

BJ's was aware of the fact that its renewal policy was not member-friendly.  One BJ's employee, in a 2007 internal communication, referred to the policy as the "punish the member rule."  (Ex. C to Woodward Aff., ECF No. 54-3.)  During

---

could not recall whether the receipts she received showed her expiration date.  (Ex. B to Renshaw Aff. (Cappalli Dep. 106:1-6), ECF No. 46-2.)

Cappalli's membership, BJ's received over 2,000 contacts from members regarding its membership renewal policy. (<u>Id.</u>)  BJ's maintains a "ticket" of each customer contact. (Def.'s Resp. ¶ 55.)  Excerpts of tickets from 2007 indicated that at least some BJ's members were surprised and upset by BJ's renewal policy. (Ex. C to Woodward Aff.)  BJ's has specific "Renewal Reset FAQs" providing pre-scripted answers to customers' questions concerning BJ's renewal policy.[5]  (Ex. A to Woodward Aff. 58.)

Moreover, BJ's internal communications indicate that at least some BJ's employees understood BJ's renewal policy to provide members with less than what they paid for.  In 2010, when a group of BJ's employees were discussing whether to recommend a change to BJ's renewal policy, a PowerPoint

---

[5]  For "Irate Members or cancellation threats only – after explaining the policy," BJ's instructs its employees to offer to extend the member's expiration date and explain that this is a "one-time exception" to BJ's policy. (Ex. A to Woodward Aff., ECF No. 54-1.)  Employees are instructed not to "suggest" this resolution to members. (Ex. C to Woodward Aff., ECF No. 54-3.) Indeed, BJ's did not advertise its willingness to extend expiration dates to its customers. (Ex. B to Woodward Aff. (Bowles Dep. 80:7-10, 81:3-5), ECF No. 54-2.)  BJ's contends that members' requests for extension of their expiration dates are "considered on a case-by-case basis." (Def.'s Resp. to Pl.'s Separate Statement of Additional Undisputed Facts ("Def.'s Resp.") ¶ 80, ECF No. 63.)  However, in ruling on BJ's motion for summary judgment, this Court must view the facts in the light most favorable to Cappalli, the non-moving party. <u>See</u> <u>Taylor</u>, 576 F.3d at 24.  Here, the record supports the inference that BJ's adjusted members' expiration dates only in rare circumstances and did not advertise this possibility to its customers.

presentation was prepared.  (Def.'s Resp. ¶ 68.)  The PowerPoint stated that BJ's "had members who were only getting 9 or 10 months of membership but paying for 12 months."  (Ex. C to Woodward Aff.)

Cappalli filed her Complaint against BJ's on October 1, 2010.  (ECF No. 1.)  On June 30, 2011, this Court denied BJ's motion to dismiss Cappalli's claims.  (ECF No. 21.) Subsequently, BJ's filed a motion asking this Court to grant summary judgment in its favor on all counts.  (ECF No. 43.) Cappalli responded by filing a motion for partial summary judgment on BJ's affirmative defenses of:  (1) "Plaintiff's claims are barred by the terms of the parties' contractual agreements;" (2) "statutes of limitations and/or statutes of fraud;" (3) failure to mitigate damages; (4) right of setoff; (5) voluntary payment; (6) laches; (7) waiver; (8) estoppel; (9) account stated; and (10) "Plaintiff's claims are not properly maintainable as a class action." (ECF Nos. 22 and 48.)

II.  Discussion

Summary judgment is appropriate when, viewing the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56; Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009).  "A genuine issue of fact exists where the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Taylor, 576 F.3d at 24 (internal citation and quotation marks omitted).

"[T]he standards are the same where, as here, both parties have moved for summary judgment." Pac. Ins. Co. v. Eaton Vance Mgmt., 369 F.3d 584, 588 (1st Cir. 2004) (quoting Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720, at 335-36 (3d ed. 1998) ("The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard."))); see also Specialty Nat'l Ins. Co. v. OneBeacon Ins. Co., 486 F.3d 727, 732 (1st Cir. 2007) ("The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review." (quoting Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 205 (1st Cir. 2006))).

A defendant moving for summary judgment on the basis of an affirmative defense "has the burden of proving the defense." Emory v. Miller, 790 F. Supp. 368, 371 (D.R.I. 1992).

A.   Breach of Contract

It is undisputed that Cappalli and BJ's entered into several contracts for renewal memberships. The parties disagree, however, concerning whether they contracted for a

renewal term of twelve months from the date of purchase or a renewal term of lesser duration. "Contract interpretation is a question of law." ADP Marshall, Inc. v. Noresco, LLC, 710 F. Supp. 2d 197, 212 (D.R.I. 2010) (quoting Clark-Fitzpatrick, Inc./Franki Found. v. Gill, 652 A.2d 440, 443 (R.I. 1994)). Thus, whether the parties contracted for a renewal term of twelve months from the date of purchase is an issue that may be properly decided by this Court at the summary judgment stage.

"In order to establish an express or implied contract a litigant must prove mutual assent or a meeting of the minds between the parties." Mills v. R.I. Hosp., 828 A.2d 526, 528 (R.I. 2003) (internal citation and quotation marks omitted). In assessing whether such mutual assent has been given, courts "look to the parties' words and actions to determine whether they have manifested the objective intent to promise or be bound." Bourque v. FDIC, 42 F.3d 704, 708 (1st Cir. 1994).

The terms of a contract are thus dependent upon the parties' objective manifestations, not their undisclosed or secret intentions. See Ret. Bd. of the Emps.' Ret. Sys. v. DiPrete, 845 A.2d 270, 284 (R.I. 2004) ("The secret intent of one party to a contract is not binding on the other party.").

While contract interpretation is generally a question of law, it "becomes a question of fact" when the contract terms are ambiguous. ADP Marshall, 710 F. Supp. 2d at 212 (quoting Gill,

652 A.2d at 443); see also Demirs v. Plexicraft, Inc., 781 F. Supp. 860, 863 (D.R.I. 1991) (denying the defendant's motion for summary judgment because interpretation of an ambiguous contract term "is a factual issue which can only be resolved at trial").

The preliminary question of whether a contractual term is ambiguous is, however, a question of law. Haviland v. Simmons, 45 A.3d 1246, 1258 (R.I. 2012). "Contract ambiguity arises only when [a contract] is reasonably and clearly susceptible of more than one interpretation." Id. at 1258 (internal citation and quotation marks omitted).

Under Rhode Island law, ambiguities in a contract must be construed against the drafter. Id. at 1259-60. An ambiguous contract should also be interpreted in accordance with one party's understanding where "that party does not know of any different meaning attached by the other, and the other knows the meaning attached by the first party." See Restatement (Second) of Contracts § 20 (1981). Additionally, ambiguity in the parties' objective manifestations may negate the mutual assent required to create an enforceable contract. See id.

Here, the parties never expressly agreed upon any particular term of renewal. Thus, in order to determine what renewal term they agreed upon, this Court must consider their objective manifestations. Viewing the evidence in the light most favorable to Cappalli, this Court finds the renewal term to

11

be ambiguous.  Two versions of the P&C's accurately described BJ's renewal policy in one section, but, in a separate section, those same documents also stated that membership was effective "for one year from enrollment."  Similarly, while the renewal notice did indicate that Cappalli's "Renewal Date" would be January 2007, it also stated that the duration of the renewal membership would be "a year."  Because Cappalli received the notice after her membership had expired, this language suggested a renewal term of one year from the date of her purchase of a renewal membership.  Even assuming that, because the notice referred to the P&C's, it incorporated the description of BJ's renewal policy included therein, see Schofield v. French, 36 F. Supp. 2d 481, 485-86 (D.R.I. 1999) ("[U]nder Rhode Island law, documents may be incorporated into a written contract merely by reference." (citing Rotelli v. Catanzaro, 686 A.2d 91, 94 (R.I. 1996))), this description was inconsistent with BJ's other manifestations.  These inconsistent provisions created ambiguity with respect to the term of the renewal membership.  See Haviland, 45 A.3d at 1259-60 (finding ambiguity concerning the standard of review to be applied to a professor's reappointment where different communications between the professor and the university set forth different standards).  The receipts provided by BJ's to Cappalli did nothing to cure this ambiguity. The Rhode Island Supreme Court has held that a receipt

12

memorializing a contractual agreement does not necessarily
reflect the terms of the underlying agreement itself. See
Preble v. Higgins, 109 A. 707, 709 (R.I. 1920) ("The memorandum
is not the agreement on which the complainant brings suit. It
is only a memorandum of the agreement."). Because the agreement
between the parties was ambiguous, the interpretation of that
agreement is a question of fact which cannot be decided by this
Court at the summary judgment stage. See ADP Marshall, 710 F.
Supp. 2d at 212.

BJ's also contends that, because Cappalli was a BJ's
member, she was bound by BJ's rules of membership, including
those contained in the P&C's, regardless of her knowledge of
those rules. The cases cited by BJ's in support of this
argument, however, all involve associations very different from
the one at issue in the present case. See Post v. Belmont
Country Club, Inc., 805 N.E. 2d 63, 67 (Mass. App. Ct. 2004)
(holding that a member of a golf club was charged with knowledge
of an indemnity clause in the club's membership handbook);
Miller v. Supreme Tent of Knights of Maccabees of the World, 185
P. 593, 593 (Wash. 1919) (involving a "fraternal benefit
association" that offered death benefits to members);
Pharmacists & Retail Drug Store Emps. Union, Local 330 v. Lake
Hills Drug Co., 255 F. Supp. 910, 912 (W.D. Wash. 1964)
(involving a "multi-employer bargaining unit" that represented

13

members in labor matters).  In <u>Post</u>, the court explicitly noted that the indemnity clause at issue "was adopted by the membership for their mutual benefit" and was subject to change by the membership.  <u>Post</u>, 805 N.E. 2d at 68-69; <u>see also</u> <u>Martin v. Metro. Yacht Club, Inc.</u>, 388 F. App'x 6, *8 (1st Cir. 2010) (charging the plaintiff with knowledge of a yacht club bylaw and emphasizing that the rule at issue was "one of several terms of a compact of the members with each other to limit the cost of membership" (citing <u>Post</u>, 805 N.E.2d at 68-69)).

In the present case, unlike in <u>Post</u> and <u>Martin</u>, there is no indication that BJ's renewal policy was subject to change by BJ's members.  Additionally, while BJ's does point out that the collection of membership fees allows it to offer low prices to members, it does not contend that the renewal policy itself benefits those members.  Unless the word "member" is treated as a talisman, BJ's is distinct from the organizations at issue in the cases it cites, and, in any event, those cases are not controlling here.[6]  Moreover, in the cases cited by BJ's, unlike in the present case, there was no indication that the membership rules at issue were ambiguous or contradicted by other documents from the organization.  <u>See, e.g.</u>, <u>Miller</u>, 185 P. at 595

---

[6] Even if BJ's could establish that Cappalli was bound by the terms of the P&C's, the P&C's did not describe BJ's renewal policy when Cappalli purchased two of her renewal memberships. Also, as previously discussed, the P&C's are internally inconsistent concerning the duration of renewal memberships.

(referring to the relevant rule as "so plain as to not admit of argument as to its meaning").

    B.   Damages

    BJ's contends that, even if this Court finds that genuine issues of fact exist concerning whether the parties contracted for a renewal term of twelve months from the date of purchase, its motion for summary judgment should be granted because Cappalli suffered no damages as a result of BJ's renewal policy. "[A]n element of a breach of contract claim is proof of damages." Chrabaszcz v. Johnston Sch. Comm., 474 F. Supp. 2d 298, 309 (D.R.I. 2007). In a breach of contract case, a damages award should seek "to place the injured party in as good a position as if the parties fully performed the contract." Nationwide Life Ins. Co. v. Steiner, 722 F. Supp. 2d 179, 187 (D.R.I. 2010) (quoting Guzman v. Jan-Pro Cleaning Sys., Inc., 839 A.2d 504, 508 (R.I. 2003)).

    Cappalli argues that, under the terms of her contract with BJ's, she was entitled to a renewal membership lasting twelve months from the date of purchase. Cappalli purchased her renewal memberships on March 26, 2006, February 15, 2007, February 2, 2008, February 12, 2009, and February 27, 2010, respectively. Each of these memberships expired on January 31 of the following year. It is undisputed that BJ's provides members a fifteen-day "grace period" after the expiration of

their prior memberships during which they may make purchases at BJ's without paying the 15% non-member surcharge. Thus, Cappalli enjoyed the full benefits of her renewal memberships through February 15. For this reason, Cappalli suffered no damages as a result of BJ's renewal policy with respect to the renewal memberships she purchased on February 15 or earlier, namely her second, third, and fourth renewal memberships.

In a similar case, Kaymak v. AAA Mid-Atl., Inc., Civil Action No. 10-6532, 2012 WL 3887040 (E.D. Pa. Sept. 7, 2012), one federal district court recently held that a AAA member lacked standing to sue AAA in connection with its renewal policy. Like Cappalli, the plaintiff in Kaymak alleged that AAA "'backdate[d]' the start date of renewal memberships to the prior year's expiration date." Id. at *1. Like BJ's, "AAA implemented a grace period policy which extends all member benefits for the first 30 days after a membership has lapsed." Id. at *3. The Kaymak court explained that the plaintiff had not suffered any injury in fact because, while she claimed to have "lost" sixteen days of membership due to AAA's renewal policy, she "still received a full 12 months of AAA membership" due to AAA's thirty-day grace period. Id. Similarly, in this case, when Cappalli renewed her membership on or before February 15, and she still enjoyed the benefits of membership through

February 15 of the following year, she got what she bargained for, if not more.

Kaymak does not, however, dictate that this Court grant BJ's motion for summary judgment with respect to Cappalli's first and fifth renewal memberships.  Because Cappalli purchased those memberships on March 26 and February 27, respectively, and her membership benefits terminated on February 15 of the following year, she did not receive a full twelve months of membership in those years.  In Kaymak, the court explicitly distinguished the case at hand from cases involving Costco and Sam's Club, BJ's competitors with similar renewal policies.  The court explained, "neither the Sam's Club member nor the Costco member received any benefits of membership once the backdated renewal membership expired.  Thus, when Sam's Club or Costco backdated the start date of a renewed membership, the member in fact received fewer than 12 months of benefits."  Id. at *5. While BJ's renewal policy is different than Costco's and Sam's Club's in that BJ's offers members a fifteen-day grace period, BJ's did not offer Cappalli any benefits after that fifteen-day period was over, irrespective of whether twelve months had passed since the date of purchase.

The fact that Cappalli never paid a surcharge at BJ's does not mean that she suffered no compensable damages as a result of BJ's renewal policy as a matter of law.  See Held v. AAA S. New

17

England, No. 3:11cv105 (SRU), 2012 WL 4023367, at *5 (D. Conn. Sept. 12, 2012) (explaining that, in a case involving the backdating of AAA memberships, "the theory of injury and damages is not based upon how many times a person was denied [benefits] during the expired period, but rather is based on the alleged prospective denial of a full 12-month membership at the time of renewal of their annual membership" (quoting Dupler v. Costco Wholesale Corp., 249 F.R.D. 29, 44 n.4 (E.D.N.Y. 2008))). Plaintiff's expert, Leo H. Kahane, in a report which is in the record, concluded that "the renewal reset policy employed by BJ's over the period covered by this case clearly led to economic harm to members renewing their membership after their expiration date, but before qualifying for a renewal reset" (Ex. D to Woodward Aff., ECF No. 54-4.)   Mr. Kahane based this conclusion on the fact that such renewing members "would receive less service than someone signing up as a new member would receive after paying the same annual fee." (Id.)   According to Kahane, the extent of this economic harm could be calculated by dividing the annual membership fee by twelve to determine the monthly membership rate and multiplying this monthly rate by the number of months lost due to the renewal reset policy. (Id.) Mr. Kahane's theory, at a minimum, creates a material issue of fact for the jury.

18

For the reasons set forth above, the Court grants BJ's motion for summary judgment on both counts with respect to Cappalli's second, third, and fourth renewal memberships, but denies that motion with respect to her first and fifth renewal memberships.

C.   BJ's Affirmative Defenses[7]

BJ's argues that Cappalli's claims fail under the voluntary payment doctrine, which "bars recovery of payments voluntarily made with full knowledge of the facts." Solomon v. Bell Atl. Corp., 9 A.D.3d 49, *55 (N.Y. App. Div. 2004) (internal citation and quotation marks omitted).  The doctrine does not, however, bar payments made under a mistake of fact.  See, e.g., Salling v. Budget Rent-A-Car Sys., Inc., 672 F.3d 442, 444 (6th Cir. 2012) (stating that voluntary payment doctrine applies "[i]n the absence of . . . mistake of fact" (internal citation and

---

[7]   As an initial matter, this Court grants Cappalli's motion for partial summary judgment with respect to BJ's affirmative defenses of:  (1) failure to state a claim; (2) "statutes of limitations and/or statutes of fraud;" (3) failure to mitigate damages; (4) laches; and (5) "Plaintiff's claims are not properly maintainable as a class action" because BJ's failed to present any argument concerning these affirmative defenses in its summary judgment papers or at the summary judgment hearing and thus waived its objection.  "Issues are considered waived if they are not accompanied by some attempt at developed argumentation."  Am. States Ins. Co. v. LaFlam, 808 F. Supp. 2d 400, 405 n.9 (D.R.I. 2011) (granting the plaintiff's motion for judgment on the pleadings and refusing to consider affirmative defenses raised in the defendant's answer but not developed in her motion papers).

quotation marks omitted)).  There is precedent suggesting that a plaintiff who negligently fails to learn the facts underlying a payment will not be able to take advantage of the mistake of fact exception to the voluntary payment doctrine.  See Spivey v. Adaptive Mktg. LLC, 622 F.3d 816, 823-24 (7th Cir. 2010) ("It is no exception to the voluntary-payment doctrine when the plaintiff makes no effort to ascertain the factual basis of the [charge] but pays it anyway." (internal citation and quotation marks omitted)); Chris Albritton Constr. Co. v. Pitney Bowes Inc., 304 F.3d 527, 532 (5th Cir. 2002) ("Regarding excusable ignorance, the voluntary payment doctrine precludes courts from extending relief to those who have neglected to take care of their interests and are in predicaments which ordinary care would have avoided." (internal citation and quotation marks omitted)).  Moreover, in some situations, courts have found it proper to dispose of this issue at the summary judgment stage.  See Spivey, 622 F.3d at 824; Chris Albritton, 304 F.3d at 532.  Other federal courts, however, have held that the applicability of the mistake of fact exception is a question of fact precluding summary judgment.  See Rickenbach v. Wells Fargo Bank, N.A., 635 F. Supp. 2d 389, 395 (D.N.J. 2009) (holding that applicability of the voluntary payment doctrine and the mistake of fact exception "raises questions of fact that cannot be resolved" on a motion to dismiss); Dynatec Drilling, Inc. v.

20

<u>Duncan Park Holdings Nev., Ltd.</u>, No. 03:05-CV-00266-LRH-VPC, 2007 WL 1063195, at *2 (D. Nev. Apr. 5, 2007) ("[T]he question of whether [the non-movant] made a mistake of fact when it made payments to [the movant] is a question of fact precluding summary judgment.").

In this case, there is a genuine dispute of fact with respect to whether Cappalli knew that her renewal memberships would expire less than twelve months from the date of purchase. While BJ's explained its renewal policy in its P&C's and on its website, there is no evidence that Cappalli ever read a description of the policy.  Similarly, although BJ's provided Cappalli with receipts that stated the expiration date of her membership, there is no evidence that Cappalli ever read those receipts.

While Cappalli may have been negligent in her failure to learn the expiration date of her BJ's membership, it is not clear that her negligence rises to the level of that at issue in cases where federal courts have granted motions for summary judgment on voluntary payment grounds.  <u>See</u> <u>Spivey</u>, 622 F.3d at 823 (plaintiff failed to inquire concerning the basis of an unknown charge appearing on his credit card statements); <u>Chris Albritton</u>, 304 F.3d at 532 (plaintiffs failed to inquire concerning a charge appearing on their bill that was prohibited by the terms of their lease).  Cappalli, unlike the plaintiffs

in those cases, did not pay a charge without ascertaining the
basis for that charge.   She knew that she was purchasing BJ's
renewal memberships.   In light of the ambiguity of BJ's
manifestations concerning the duration of those renewal
memberships, there is a genuine issue of fact concerning whether
Cappalli's failure to exercise ordinary care bars her from
recovering for breach of contract.   See Spagnola v. Chubb Corp.,
574 F.3d 64, 73 (2d Cir. 2009) (reversing the district court's
dismissal of the plaintiff's breach of contract claim on
voluntary payment grounds where the plaintiff alleged that "his
lack of full knowledge was not due to a lack of diligence, but
instead due to being misled by [the defendant]").   The existence
of such a genuine dispute of material fact precludes this Court
from granting either party's motion for summary judgment
concerning the affirmative defense of voluntary payment.

In a brief footnote, BJ's asserts that Cappalli's claims
are also barred by the doctrines of waiver, equitable estoppel,
and account stated.   With respect to waiver, a grant of summary
judgment in favor of either party would be inappropriate for the
same reasons that it is inappropriate with respect to the
voluntary payment doctrine.   "Waiver is the voluntary
intentional relinquishment of a known right."   1800 Smith St.
Assocs., LP v. Gencarelli, 888 A.2d 46, 54 (R.I. 2005) (internal
citation and quotation marks omitted).   Here, there is a genuine

22

issue of fact concerning whether Cappalli knew about BJ's renewal policy, and, thus, it is unclear whether her continuing relationship with BJ's may fairly be characterized as a "voluntary intentional relinquishment of a known right." See Violet v. Travelers Express Co., 502 A.2d 347, 349 (R.I. 1985) ("As a general rule, whether a party has voluntarily relinquished a known right is a question for the trier of fact.").

The doctrines of equitable estoppel and account stated are not directly applicable to the facts of this case, and, for this reason, Cappalli's motion for summary judgment is granted with respect to these affirmative defenses. Under Rhode Island law, equitable estoppel requires:

> an affirmative representation or equivalent conduct on the part of the person against whom the estoppel is claimed which is directed to another for the purpose of inducing the other to act or fail to act in reliance thereon; and . . . , that such representation or conduct in fact did induce the other to act or fail to act to his injury.

Sturbridge Home Builders, Inc. v. Downing Seaport, Inc., 890 A.2d 58, 67 (R.I. 2005) (internal citation omitted). In the instant case, BJ's has not presented evidence that it relied upon Cappalli's alleged agreement to a renewal term of less than twelve months. In fact, to the contrary, the evidence indicates that BJ's was aware of the fact that many of its customers were

ignorant of its renewal policy and did not intend to enter into an agreement for a term of less than twelve months.

The Rhode Island Supreme Court has described an "account stated" as "a striking of a balance by an arithmetical computation of debits and credits resulting from a running account between the parties and followed thereafter by an expressed or tacit promise by one, found to be indebted to the other, to pay the agreed balance determined to be owed." Mello v. Coy Real Estate Co., 234 A.2d 667, 671-72 (R.I. 1967). In the present case, the dispute does not involve the payment of a balance comprised of separate items. The receipts provided to Cappalli by BJ's reflected single transactions. Moreover, Cappalli and BJ's never entered into a debtor-creditor relationship.

Finally, Cappalli's motion for summary judgment on BJ's affirmative defense that "Plaintiff's claims are barred by the terms of the parties' contractual agreements" is denied. As previously discussed, there is a genuine issue of fact concerning whether the parties contracted for a renewal membership term of twelve months from the date of purchase. If, instead, the parties contracted for a renewal membership of lesser duration, Cappalli's claims must fail.

D.   Atkinson Deposition

After the initiation of this lawsuit, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, BJ's designated Michael Atkinson as its corporate representative to testify to the factual bases for BJ's affirmative defenses. BJ's also objected to this line of questioning to the extent it sought "testimony concerning BJ's legal theories, and therefore s[ought] testimony concerning matters that are subject to the attorney-client privilege and work product doctrine." (Def.'s Separate Statement of Undisputed Facts ¶ 4, ECF No. 67.) At his deposition, on the advice of counsel, Atkinson refused to respond to a question asking for the "factual basis" underlying BJ's affirmative defense that "Plaintiff's claims are barred by the terms of the parties' contractual agreements." (Ex. C to Woodward Aff. (Atkinson Dep. 231:1-234:9), ECF No. 50-3.) Atkinson subsequently agreed that he was refusing to provide the "factual bases" for all of BJ's affirmative defenses. (Id. at 244:23-245:16.) Atkinson did, however, testify concerning Cappalli's membership with BJ's, BJ's renewal policy, and the P&C's and their availability to members, among other things.

Cappalli contends that this Court should grant her motion for partial summary judgment because of Atkinson's refusal to respond to these deposition questions. This argument fails for two reasons. First, the questions posed to Atkinson by BJ's

25

counsel were improper.   See Am. Nat'l Red Cross v. Travelers Indem. Co., 896 F. Supp. 8, 14 (D.D.C. 1995) (denying a motion for summary judgment predicated upon a 30(b)(6) witness's failure to respond to similar questions on the grounds that those questions "intruded upon protected work product").   BJ's could have obtained the information it sought by posing purely factual questions.   Instead, it asked questions that required Atkinson to relate the underlying facts to BJ's legal theories. Second, even assuming that Cappalli's questions were proper and should have been answered, discovery violations may be waived if they are not raised in a timely manner.   See, e.g., JOM, Inc. v. Adell Plastics, Inc., 193 F.3d 47, 51 (1st Cir. 1999) (affirming the denial of a motion to exclude because the issue should have been raised during discovery).   Here, after Atkinson's deposition, held on November 22, 2011, Cappalli never filed a motion to compel.   Rather, seven months later, she raised the issue in a motion for summary judgment.   BJ's should not be allowed to use Atkinson's deposition as a trap; if it really wanted answers, it could have moved to compel.

With respect to the affirmative defense that "Plaintiff's claims are barred by the terms of the parties' contractual agreements," Cappalli characterizes Atkinson's testimony as indicating that there is no agreement between BJ's and its customers concerning BJ's renewal policy.   This characterization

26

is inaccurate.   While Atkinson testified that there is no
"written contract" in which BJ's members agree to the renewal
policy reflected in the P&C's, he did not testify that BJ's
members never agree to the renewal policy in some other manner.
(Ex. C to Woodward Aff. (Atkinson Dep. 159:21), ECF No. 50-3.)

     E.   Money had and Received

     In addition to her breach of contract claim, Cappalli
brings an equitable claim of money had and received.   This claim
is essentially one of unjust enrichment.   See 66 Am. Jur. 2d
Restitution and Implied Contracts § 156 (2011) ("An action for
'money had and received,' or the more modern action for 'unjust
enrichment,' is said to be a remedy equitable in nature . . . ."
(footnotes omitted)).   As this Court recognized in its denial of
BJ's motion to dismiss, "it is permissible under Rhode Island
law to plead an equitable cause of action in the alternative
where an express contract exists." Cappalli v. BJ's Wholesale
Club, Inc., CA 10-407 S, 2011 WL 2606912, at *3 (D.R.I. June 30,
2011) (citing Hasbro, Inc. v. Mikohn Gaming Corp., No. Civ. A.
05-106 S, 2006 WL 2035501, at *8 (D.R.I. July 18, 2006)).
However, this Court has also held that "[u]njust enrichment,
like other quasi-contractual remedies, is a vehicle for
equitable recovery where no rights on an enforceable contract
exist." Hasbro, Inc. v. Mikohn Gaming Corp., 491 F. Supp. 2d
256, 264 (D.R.I. 2007).   In Hasbro, this Court granted the

defendant's motion for summary judgment on the plaintiff's unjust enrichment claim, explaining that the plaintiff's "claim is based on a disputed term in the contract, and not on an allegation or evidence that the contract is in some way unenforceable (a claim that could support recovery under unjust enrichment)." Id. In the present case, by contrast, there is a genuine issue of fact material to the enforceability of the agreement between Cappalli and BJ's. The fact-finder may determine that there was no meeting of the minds because the parties each attached different meanings to their manifestations. See Restatement (Second) of Contracts § 20. Thus, Cappalli's breach of contract claim does not preclude her from proceeding to trial with her claim of money had and received.

"An action for money had and received 'is maintainable whenever one person has money which in equity and good conscience belongs to another.'" Cappalli, 2011 WL 2606912, at *3 (quoting Fuscellaro v. Indus. Nat'l Corp., 117 R.I. 558, 564 (1977)); see also Williams v. Smith, 72 A. 1093, 1101 (R.I. 1909) ("An action for money had and received will lie where one has obtained money from another by oppression, imposition, extortion, or deceit; and the law implies a promise from such person to return it to the lawful owner." (internal citation and quotation marks omitted)). However, "[s]imply conferring a

28

benefit . . . is not sufficient to establish a claim for unjust enrichment. The most significant requirement . . . is that the enrichment to the defendant be unjust." Ciampi v. Zuczek, 598 F. Supp. 2d 257, 263 (D.R.I. 2009) (quoting R & B Elec. Co. v. Amco Constr. Co., 471 A.2d 1351, 1356 (R.I. 1984)).

BJ's motion for summary judgment is denied with respect to Cappalli's first and fifth renewal memberships. There is evidence in the record indicating that BJ's was aware of the fact that its customers were being misled concerning its renewal policy and continued the policy nonetheless. This evidence is sufficient to create a genuine issue of fact material to Cappalli's equitable claim.

BJ's argument that, even if Plaintiff can successfully establish the elements of her claim of money had and received, any damages must be offset by the benefit she gained from her BJ's membership, namely waiver of the 15% non-member surcharge, is baseless. Contrary to BJ's contentions, equitable relief is not an all or nothing proposition. This Court can grant relief without placing the parties in the position they would have been in had the transaction between them never occurred. See Dellagrotta v. Dellagrotta, 873 A.2d 101, 114-15 (R.I. 2005) (upholding the defendant's award for unjust enrichment for improvements made to a house as well as the trial judge's refusal "to offset the award to account for the defendant's use

and occupancy of the property"). Thus, Cappalli's motion for summary judgment on BJ's affirmative defense of "right of setoff for discounts Plaintiff received to which she was not entitled," is granted.

III. Conclusion

For the reasons stated above, Defendant's motion for summary judgment is GRANTED on both counts with respect to Cappalli's second, third, and fourth renewal memberships. Defendant's motion for summary judgment is DENIED on both counts with respect to Cappalli's other two renewal memberships.

Plaintiff's motion for partial summary judgment is GRANTED with respect to BJ's affirmative defenses of failure to state a claim, "statutes of limitations and/or statutes of fraud," failure to mitigate damages, right of setoff, laches, estoppel, account stated, and "Plaintiff's claims are not properly maintainable as a class action." Plaintiff's motion for summary judgment is DENIED with respect to BJ's three remaining affirmative defenses, namely "Plaintiff's claims are barred by the terms of the parties' contractual agreements," voluntary payment, and waiver.

IT IS SO ORDERED.

*/s/ William E. Smith*
William E. Smith
United States District Judge
Date: November 7, 2012

30