UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| IRENE CAPPALLI, individually and on behalf of all others similarly situated, ) ) ) | |
| Plaintiff, ) | CIVIL ACTION |
| v. ) | No. 10-cv-00407 |
| BJ'S WHOLESALE CLUB, INC., ) ) | |
| Defendant. ) ) | |

## OPPOSITION TO PLAINTIFF'S
## MOTION FOR CLASS CERTIFICATION

Beth I. Z. Boland, *admitted pro hac vice*
  beth.boland@bingham.com
Brandon L. Bigelow, *admitted pro hac vice*
  brandon.bigelow@bingham.com
Carol E. Head (# 6501)
  carol.head@bingham.com
Emily E. Renshaw, *admitted pro hac vice*
  emily.renshaw@bingham.com
**BINGHAM MCCUTCHEN LLP**
One Federal Street
Boston, MA  02110-1726
Tel. (617) 951-8000
Fax (617) 951-8736

*Counsel for Defendant, BJ's Wholesale Club, Inc.*

Dated:  February 12, 2013

A/75387701.2

# TABLE OF CONTENTS

**Page**

I.      **INTRODUCTION**.................................................................................1

II.     **STATEMENT OF FACTS**......................................................................3

A.   The Renewal Term Of Each Individual Membership, Including Cappalli's, Is Defined By The "Objective Manifestations" Of The Parties.........................................3

B.   The P&Cs And The Manner In Which They Are Provided To Members Have Varied Over Time. ..............................................................................5

   1.   The P&Cs and their disclosure of the renewal policy have varied over time. .............................................................................5

   2.   The manner in which the membership P&Cs and renewal terms have been disclosed to and acknowledged by members have varied over time. ...............6

C.   Membership Can Be The Subject Of Case-By-Case Negotiations Between BJ's And Members That Are Unique To Each Member. ......................................................7

D.   Cappalli Has Not Shown That Class-Wide Damages Can Be Proven Through Common Proof....................................................................10

III.    **ARGUMENT**....................................................................................12

A.   Cappalli Bears The Burden Of Proving That All Class Certification Prerequisites Are "In Fact" Met, And This Court Must Conduct A "Rigorous Analysis" Of That Proof"...........................................................................12

B.   *Dupler*, *Argento*, And *Held* Militate Against Class Certification In This Case. .........14

C.   Individual Inquiries Concerning Contract Formation And Assent To The Renewal Policy Defeat Commonality and Predominance. ......................................................15

   1.   Cappalli fails to establish a common question of law or fact. ........................16

   2.   Cappalli fails to prove that common questions predominate as to the breach of contract claim................................................................18

   3.   Cappalli fails to prove that common questions predominate as to the unjust enrichment claim...............................................................23

D.   Individual Inquiries Concerning Affirmative Defenses Further Defeat Predominance.......................................................................24

E.   Cappalli Has Not Attempted To Show That Class-Wide Damages Can Be Established Through Common Proof, Nor Has She Shown That The Members Of The Class Are Even Ascertainable. .............................................................26

   1.   Class-wide damages cannot be established through common proof. .............26

   2.   Cappalli has not provided any means for identifying the actual members of the proposed class. ............................................................28

F.   Cappalli's Deficient Choice-Of-Law Analysis Is Yet Another Reason To Deny Class Certification................................................................29

|   | G. | Cappalli Fails To Prove That A Class Action Is The Best Method Of Adjudicating This Controversy | 33 |
| **IV.** | | **CONCLUSION** | **34** |

A/75387701.2

# TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE(S)**

Abla v. Brinker Rest. Corp.,
  279 F.R.D. 51 (D. Mass. 2011) ................................................................................19, 23

Advanced Acupuncture Clinic, Inc. v. Allstate Ins. Co.,
  2008 WL 4056244 (D.N.J. 2008) ........................................................................14

Alberton v. Commw. Land Title Ins. Co.,
  247 F.R.D. 469 (E.D. Pa. 2008)...........................................................................20

Amchem Prods., Inc. v. Windsor,
  521 U.S. 591 (1997).............................................................................................18

In re Aqua Dots Prods. Liab. Litig.,
  270 F.R.D. 377 (N.D. Ill. 2010)...........................................................................31

Argento v. Wal-Mart Stores, Inc.,
  66 A.D.3d 930 (N.Y. App. Div. 2009) .................................................................14

AT&T Mobility LLC v. Concepcion,
  131 S. Ct. 1740 (2011).........................................................................................12

Barrus v. Dick's Sporting Goods, Inc.,
  732 F. Supp. 2d 243 (W.D.N.Y. 2010) ................................................................31

Basco v. Wal-Mart Stores, Inc.,
  216 F. Supp. 2d 592 (E.D. La. 2002) ...................................................................19

Behrend v. Comcast Corp.,
  655 F.3d 182 (3d Cir. 2011).................................................................................26

Bielass v. New England Safe Sys., Inc.,
  617 F. Supp. 682 (D. Mass. 1985) .......................................................................16

Broussard v. Meineke Disc. Muffler Shops,
  155 F.3d 331 (4th Cir. 1998) .................................................................18, 25, 27

Casa Orlando Apts., Ltd. v. Fed. Nat'l Mortg. Ass'n,
  624 F.3d 185 (5th Cir. 2010) ...............................................................................31

In re Checking Account Overdraft Litig.,
  2012 WL 3265093 (S.D. Fla. 2012) .....................................................................23

Chudner v. Transunion Interactive, Inc.,
  2010 WL 5662966 (D. Del. 2010) .......................................................................27

- iii -

*Clausnitzer v. Fed. Express Corp.*,
    248 F.R.D. 647 (S.D. Fla. 2008) ..........................................................................19

*Clay v. Am. Tobacco Co.*,
    188 F.R.D. 483 (S.D. Ill. 1999) ...........................................................................32

*CLN Props., Inc. v. Republic Servs., Inc.*,
    688 F. Supp. 2d 892 (D. Ariz. 2010) ..................................................................30

*Cohn v. Mass. Mut. Life Ins. Co.*,
    189 F.R.D. 209 (D. Conn. 1999) ........................................................................20

*Crosby v. Soc. Sec. Admin. of U.S.*,
    796 F.2d 576 (1st Cir. 1986) ........................................................................12, 28

*Cruz v. Lawson Software, Inc.*,
    2010 WL 890038 (D. Minn. 2010) .....................................................................31

*De Giovanni v. Jani-King Int'l, Inc.*,
    262 F.R.D. 71 (D. Mass. 2009) ..........................................................................17

*Dupler v. Costco Wholesale Corp.*,
    249 F.R.D. 29 (E.D.N.Y. 2008) ....................................................................14, 15

*Dupler v. Costco Wholesale Corp.*,
    705 F. Supp. 2d 231 (E.D.N.Y. 2010) ..................................................................2

*Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*,
    254 F.R.D. 68 (E.D.N.C. 2008) ..........................................................................31

*Gariety v. Grant Thornton, LLP*,
    368 F.3d 356 (4th Cir. 2004) ..............................................................................30

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) ............................................................................................13

*Gintis v. Bouchard Transp. Co., Inc.*,
    596 F.3d 64 (1st Cir. 2010) .................................................................................14

*Gregory v. Finova Capital Corp.*,
    442 F.3d 188 (4th Cir. 2006) ..............................................................................33

*Held v. AAA S. New England*,
    2012 WL 4023367 (D. Conn. 2012) ..............................................................14, 15

*Hunt v. U.S. Tobacco Co.*,
    538 F.3d 217 (3d Cir. 2008) ...............................................................................20

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008).............................................................27

*Jermyn v. Best Buy Stores, L.P.*,
  256 F.R.D. 418 (S.D.N.Y. 2009) ......................................................23

*John v. Nat'l Sec. Fire & Cas. Co.*,
  501 F.3d 443 (5th Cir. 2007) ......................................................12, 28

*Kottler v. Deutsche Bank AG*,
  2010 WL 1221809 (S.D.N.Y. 2010)..................................................31

*Kreger v. Gen. Steel Corp.*,
  2010 WL 2902773 (E.D. La. 2010) ...................................................17

*London v. Walmart Stores, Inc.*,
  340 F.3d 1246 (11th Cir. 2002) ........................................................22

*Makuc v. Am. Honda Motor Co., Inc.*,
  835 F.2d 389 (1st Cir. 1987).............................................................13

*Marino v. Home Depot U.S.A., Inc.*,
  245 F.R.D. 729 (S.D. Fla. 2007) .......................................................31

*Mattoon v. City of Pittsfield*,
  128 F.R.D. 17 (D. Mass. 1989)..........................................................34

*McCracken v. Best Buy Stores, L.P.*,
  248 F.R.D. 162 (S.D.N.Y. 2008) ......................................................19

*In re McDonald's French Fries Litig.*,
  257 F.R.D. 669 (N.D. Ill. 2009).........................................................31

*Mick v. Level Propane Gases, Inc.*,
  203 F.R.D. 324 (S.D. Ohio 2001) .....................................................20

*Muehlbauer v. Gen. Motors Corp.*,
  2009 WL 874511 (N.D. Ill. 2009) .....................................................31

*In re New Motor Vehicle Canadian Exp. Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008)............................................................18, 26

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  259 F.3d 154 (3d Cir. 2001).............................................................27

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)..........................................................................29

A/75387701.2

*Pilgrim v. Universal Health Card, LLC*,
   2010 WL 1254849 (N.D. Ohio 2010) .................................................................. 31

*In re PolyMedica Corp. Sec. Litig.*,
   432 F.3d 1 (1st Cir. 2005) ................................................................................... 13

*Ramirez v. DeCoster*,
   194 F.R.D. 348 (D. Me. 2000) ............................................................................. 19

*Roberts v. Rhode Island*,
   2000 WL 33671759 (D.R.I. 2000) ....................................................................... 13

*Salvas v. Wal-Mart Stores, Inc.*,
   452 Mass. 337 (2008) .......................................................................................... 20

*Sanneman v. Chrysler Corp.*,
   191 F.R.D. 441 (E.D. Pa. 2000) .......................................................................... 29

*Shroder v. Suburban Coastal Corp.*,
   729 F.2d 1371 (11th Cir. 1984) ........................................................................... 22

*Siegel v. Shell Oil Co.*,
   256 F.R.D. 580 (N.D. Ill. 2008) ..................................................................... 31, 32

*Slapikas v. First Am. Title Ins. Co.*,
   250 F.R.D. 232 (W.D. Pa. 2008) ......................................................................... 20

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
   323 F.3d 32 (1st Cir. 2003) ...................................................................... 12, 13, 24

*Spence v. Glock, Ges.m.b.H.*,
   227 F.3d 308 (5th Cir. 2000) ............................................................................... 30

*Spencer v. Hartford Fin. Servs. Group, Inc.*,
   256 F.R.D. 284 (D. Conn. 2009) .......................................................................... 31

*Sprague v. Gen. Motors Corp.*,
   133 F.3d 388 (6th Cir. 1998) ........................................................................ 18, 25

*In re St. Jude Med., Inc.*,
   425 F.3d 1116 (8th Cir. 2005) ............................................................................. 29

*Thompson v. Bayer Corp.*,
   2009 WL 362982 (E.D. Ark. 2009) ..................................................................... 31

*Thompson v. Jiffy Lube Int'l, Inc.*,
   250 F.R.D. 607 (D. Kan. 2008) ........................................................................... 31

A/75387701.2

*True v. Conagra Foods, Inc.*,
  2011 WL 176037 (W.D. Mo. 2011) ...................................................31

*Tyler v. Alltel Corp.*,
  265 F.R.D. 415 (E.D. Ark. 2010).....................................................31

*Van West v. Midland Nat'l Life Ins. Co.*,
  199 F.R.D. 448 (D.R.I. 2001) ..........................................................28

*Vega v. T-Mobile USA, Inc.*,
  564 F.3d 1256 (11th Cir. 2009) ................................................. passim

*Vulcan Golf, LLC v. Google Inc.*,
  254 F.R.D. 521 (N.D. Ill. 2008).................................................31, 32

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011)......................................................12, 13, 16, 17

*Walsh v. Ford Motor Co.*,
  807 F.2d 1000 (D.C. Cir. 1986) .......................................................30

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
  208 F.3d 288 (1st Cir. 2000)........................................................13, 24

*Windham v. Am. Brands, Inc.*,
  565 F.2d 59 (4th Cir. 1977) .............................................................27

## STATUTES

Conn. Gen. Stat. § 52-576 .................................................................30

10 Del. C. § 8106 ...............................................................................30

Fla. Stat. § 95.11 ...............................................................................30

Ga. Code § 9-3-24 .............................................................................30

Mass. Gen. Laws c. 260, § 2 .............................................................30

Md. Code Cts. & Jud. Proc. § 5-101 .................................................30

14 Me. Rev. Stat. § 752 .....................................................................30

N.C. Gen. Stat. § 1-52 .......................................................................30

N.H. Rev. Stat. § 508:4 .....................................................................30

N.J. Stat. § 2A:14-1............................................................................30

N.Y. C.P.L.R. § 213 ...........................................................................................................30

42 Pa. C.S.A. § 5525 ........................................................................................................30

Va. Code § 8.01-246 .........................................................................................................30

**RULES**

Fed. R. Civ. P. 23............................................................................................... passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 Advisory Committee Note (2003) ...................................................14

*Manual For Complex Litigation* (3d ed. 1990)............................................................14

*Newberg on Class Actions* (4th ed. 2002)...................................................................19

- viii -

## I.      INTRODUCTION

From the beginning of this case, plaintiff, Irene Cappalli, has steadfastly argued that the assented-to terms of the contracts between her and BJ's Wholesale Club, Inc. ("BJ's"), were not defined by the BJ's member privileges and conditions ("P&Cs") or any other "form" contract. Rather, Cappalli insisted that any contract between her and BJ's arose solely from the words and documents that she and representatives of the BJ's exchanged and the actions they took at the time of each transaction.  Cappalli's strategy of disclaiming all written documents as part of her contract with BJ's, and professing ignorance of BJ's renewal policy, may have spared some of her individual claims from dismissal, but it did so at the cost of class certification.  Under Cappalli's theory, the Court would need to determine the interactions that occurred during millions of unique transactions.  The law is well-established that millions of unique oral or implied-in-fact agreements do not make out a factual basis for class certification.

Although she does not even recall the facts giving rise to her individual contracts with BJ's, Cappalli contends that there are common issues arising from millions of other individual contracts for the Court to certify a class composed of "[a]ll persons in the United States who, from October 1, 2000 through the date the Class is certified, (1) purchased a renewal membership from BJ's at least sixteen days after the expiration of their prior memberships, and (2) whose renewal memberships were deemed to expire less than twelve months from the date of purchase . . . ."  Memo. in Support of Pl.'s Mot. for Class Certification ("Cappalli Memo.") at 15.  This proposed class definition assumes -- without proof -- that putative class members did not assent to BJ's renewal policy, and that BJ's does not have the right to adopt a renewal policy that provides members with an additional twelve months of membership measured from the expiration of their prior membership.  Both assumptions are false.

There is no basis to assume that every single member of the proposed class was not aware of and did not assent to BJ's renewal policy.  The record evidence shows that BJ's advises its members of its renewal policy, that some members assent to this policy, and that others seek to renegotiate the terms of their membership.  BJ's renewal policy is standard in the membership club industry, is a policy used by all of BJ's competitors, and is based on the fundamental right of BJ's and its members to contract for whatever terms and conditions of membership they wish -- a right recognized by this Court and by the court in *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231 (E.D.N.Y. 2010).

Just as Cappalli asserts she had a separate understanding with BJ's about the terms of her membership, BJ's negotiates membership terms with other members on a case-by-case basis, and BJ's has a right to defend each of these contracts based on the specific facts unique to each transaction.  Each of the millions of contracts formed over the last ten years depends on individualized inquiries as to whether a particular member was told of the policy or was already aware of it when they renewed, and manifested -- either implicitly or explicitly -- their assent to it.  The circumstances giving rise to the formation of each contract are not common across the class, and overwhelm any common issues Cappalli claims exist.

Cappalli also has not made any effort to carry her burden to show that class-wide damages can be proven through proof common to the proposed class; in fact, she has not even shown that the members of the proposed class are ascertainable.  Cappalli also has not made any effort to show how this case could be tried efficiently under the laws of 15 different states.  In short, Cappalli has not demonstrated that a class action is superior to all other methods for resolving this controversy.  For all of these reasons, Cappalli's motion should be denied.

## II.     STATEMENT OF FACTS

### A.     The Renewal Term Of Each Individual Membership, Including Cappalli's, Is Defined By The "Objective Manifestations" Of The Parties.

Throughout this case, Cappalli has argued that she never agreed to and is not bound by the terms set forth in the P&Cs or any other form contract.  After BJ's moved to dismiss the Complaint because the claims were barred by the express terms of the renewal provision contained in the P&Cs, Cappalli's counsel argued: "[T]here's no evidence at all before the Court that Ms. Cappalli ever assented to these privileges or conditions, that they were ever made a part of her contract whatsoever . . . . [T]here's nothing here that shows that Ms. Cappalli ever assented to any privileges or conditions."  6/6/11 Tr. at 20:8-11, 27:11-12.[1]

During the argument on cross motions for summary judgment last fall, Cappalli's counsel declared: "There's no document whatsoever that says there's anything at all.  She doesn't sign a document.  Uncontroverted testimony from [a BJ's representative] is the only deal we have with our customer is they give us $45 and we give them the right to access our store for 12 months.  There's no agreement with the customer.  The customer doesn't sign anything."  9/14/12 Tr. at 27:8-14.  Instead, Cappalli argued that "any contractual relationship between the parties is best characterized as implied in fact."  Cappalli SJ Opp. at 10 (Dkt. No. 53).

BJ's has a right to adopt a renewal policy that provides members with an additional twelve months of membership measured from the expiration of their prior membership.  BJ's adopted its current two-month renewal policy in the wake of the decision in *Dupler* approving

---

[1] Relevant excerpts of deposition transcripts are attached as exhibits to the Affidavit of Emily Renshaw ("Renshaw Aff."), and are cited as "[Deponent Last Name] Depo. Tr." Deposition exhibits are attached as exhibits to the Renshaw Affidavit with the corresponding transcript and cited as "[Deponent Last Name] Depo. Ex. __".   Relevant excerpts of hearing transcripts are attached as Exhibit A to the Renshaw Affidavit and are cited as "[Date of Hearing] Tr."

precisely the same policy for Costco.  As the Court observed during argument on cross motions

for summary judgment filed by BJ's and Cappalli last fall:

> Well, they're a business . . . . I'm just saying they have a right to operate their
> business and to operate it this way, it seems to me, just as much as the consumer
> has the right to manipulate the system to her benefit.  I'm not saying she doesn't
> have that right.  But what I'm getting at is if you're going to outsmart the system,
> don't you have to outsmart it in advance, not after the fact?

9/14/12 Tr. at 24:13-21.  The real question, then, is whether each of BJ's millions of members

actually assented to the renewal policy.

Cappalli joined BJ's on November 11, 2005 through a free 60-day membership.  SJ Order

at 2 (Dkt. No. 74).  She renewed her membership at the membership desk of the BJ's store in

Coventry, Rhode Island on March 26, 2006, February 15, 2007, February 2, 2008, and February

12, 2009, and each time received a receipt showing that her membership would expire in January

of the following year.  *Id*. at 2, 5.  Throughout this time, BJ's membership desk personnel were

directed to provide a copy of the P&Cs to anyone who purchases a membership, and Cappalli

received renewal notices directing her to BJ's website for the terms of the P&Cs.  *Id*. at 4;

Atkinson Depo. Ex. 11.[2]  She purchased a BJ's renewal membership online at the BJ's website

on February 27, 2010.  Cappalli Depo. Tr. 55:10-56:1, Ex. 6; 151:10-15 (Renshaw Aff. Ex. B).

Like the receipts she received from BJ's at the membership desk, the printed confirmation of that

renewal transaction expressly stated that Cappalli's renewal membership would expire in

"01/2011."  *Id*.[3]  Despite BJ's repeated attempts to notify her of its renewal policy, Cappalli

---

[2] Attached as Ex. A to the Declaration of Martin Woodward in Support of Plaintiff's
Motion for Class Certification at 64-65 (Dkt. No. 78) ("Woodward Aff.").

[3] Before her final renewal in February 2010, she spoke with an attorney, Peter Wasylyk --
who was (and apparently continues to be) Cappalli's employer -- regarding her BJ's membership
and a claim against BJ's.  Cappalli Depo. Tr. 138:6-139:15, Ex. 10 (Response to Int. No. 5).

"assumed" that her membership would always be measured 12 months from the date of her renewal.  Cappalli Depo. Tr. 135:2-136:2.

The Court found that the P&Cs were ambiguous;[4] that "the parties never expressly agreed upon any particular term of renewal"; that "in order to determine what renewal term they agreed upon, this Court must consider their objective manifestations"; that Cappalli's renewal receipts did "not necessarily reflect the terms of the underlying agreement"; and that "[b]ecause the agreement between the parties was ambiguous, the interpretation of that agreement is a question of fact . . . ." SJ Order at 11, 13.  The Court also denied summary judgment *for either party* on BJ's affirmative defense under the "voluntary payment doctrine" -- which "bars recovery of payments voluntarily made with full knowledge of the facts" -- because there was "a genuine dispute of fact with respect to whether Cappalli knew that her renewal memberships would expire less than twelve months from the date of purchase." *Id.* at 19, 21.

**B.      The P&Cs And The Manner In Which They Are Provided To Members Have Varied Over Time.**

**1.      The P&Cs and their disclosure of the renewal policy have varied over time.**

As the Court has observed, the terms of the BJ's membership P&Cs have varied over time. *Id*. at 12.  At the time Cappalli joined BJ's in November 2005, and purchased her first renewal membership in 2006, the P&Cs provided that "[m]embers who renew their Memberships during their expiration month, or within three (3) months after the expiration month, will retain their current expiration month for the renewed year." Atkinson Depo. Ex. 13 (Woodward Aff. Ex. A at 67).  In early April 2008, BJ's shortened its renewal policy from three

---

[4] The Court found that two different versions of the P&Cs accurately described BJ's renewal policy in one section, but in a separate section, stated that membership was effective "for one year from enrollment."  SJ Order at 12.

months to one month, and adopted P&Cs that did not make reference to its renewal policy. Atkinson Depo. Ex. 13 (Woodward Aff. Ex. A at 68); Def.'s LR CV 56(a)(1) Statement of Undisputed Facts ¶ 10 (Dkt. No. 47) ("Def.'s SUF").  In September 2010, BJ's adopted the same two-month renewal policy blessed by the court in *Dupler* and adopted by both Costco and Sam's Club; since then, the BJ's membership P&Cs have stated that "[m]emberships renewed within 2 months after expiration of the current Membership year will be extended for 12 months from the expiration date.  Memberships renewed more than 2 months after such expiration will be extended for 12 months from the renewal date."   Atkinson Depo. Ex. 13 (Woodward Aff. Ex. A at 71); Def.'s SUF ¶ 12.

> **2.     The manner in which the membership P&Cs and renewal terms have been disclosed to and acknowledged by members have varied over time.**

BJ's offers two types of memberships:   "Inner Circle" memberships for household customers and business memberships for business customers.  Def.'s SUF ¶ 3.  BJ's offers new members several options for purchasing a membership:  they can enroll at the membership desk; return a membership registration form by mail; or join online at BJ's website.  Atkinson Depo. Tr. 36:13-38:17; 229:19-22 (Renshaw Aff. Ex. C).   Renewing members can renew their membership in one of several ways:  by renewing at the membership desk; by purchasing a renewal membership at the point of sale (POS), *i.e.* at the register at the time of checkout; by returning one of two renewal forms mailed to members (one sent the month the membership is due to expire, and a second sent shortly after the membership has expired); or by going to the BJ's website and renewing online.  Atkinson Aff. ¶ 3; Atkinson Depo. Tr. 36:13-38:17; 229:19-22.  BJ's telephone member care specialists can also process new and renewal memberships. Meissner Depo. Tr. 21:24-22:3 (Renshaw Aff. Ex. D).

BJ's makes its membership P&Cs available to new and renewing members in writing in a variety of ways.  Members who purchase or renew at an in-store membership desk have personal interactions with BJ's membership desk employees, who are trained to provide information regarding BJ's memberships generally, and an individual member's membership specifically. Atkinson Aff. ¶ 4; Douglas Aff. ¶ 3.  Copies of BJ's P&Cs are available at the membership desk in every BJ's club.  Bowles Depo. Tr. 59:22-25 (Renshaw Aff. Ex. E); Atkinson Depo. Tr. 135:5-9; 135:24-136:6.  Members who purchase a new or renewal membership online are provided a link to the P&Cs, which are also discussed in detail in the online membership FAQs. Atkinson Depo. Tr. 135:5-8.  Members who join or renew by mail are directed in the renewal notice to the fact that the P&Cs are available online; and members who renew at the checkout may access the P&Cs either online at BJ's website or at the in-store membership desk.  Atkinson Depo. Tr. 135:5-8; Bowles Depo. Tr. 59:22-25.

#### C.    Membership Can Be The Subject Of Case-By-Case Negotiations Between BJ's And Members That Are Unique To Each Member.

BJ's offers members several different methods for raising any customer satisfaction issues and concerns they may have, including, but not limited to, issues with their BJ's membership and inquiries concerning BJ's renewal policy.  Members may speak with an in-store representative at the membership desk of any BJ's club; they may call a BJ's member care specialist at a toll-free number; they may email a BJ's member care specialist; they may send written correspondence to a member care specialist; or they may "tweet" their comment or concern to BJ's through BJ's customer service Twitter account.  Atkinson Aff. ¶ 6; Meissner Depo. Tr. 20:22-21:3.

BJ's provides its membership desk personnel and member care specialists with suggested guidelines for responding to members' customer service issues.  For instance, in October 2003,

A/75387701.2

BJ's issued an action memo detailing the suggested manner in which a BJ's employee should respond to a member who has questions regarding, or is dissatisfied with, BJ's renewal policy. Atkinson Depo. Ex. 25 (Woodward Aff. Ex. A at 74-78). BJ's also issues similar guidelines for its member care specialists. Meissner Depo. Ex. 6. Under the suggested guidelines, BJ's practice is to first explain BJ's membership renewal policy and the justification for the policy, so that the member can understand and accept the policy. Atkinson Aff. ¶ 7; Douglas Aff. ¶ 4; Atkinson Depo. Ex. 25 (Woodward Aff. Ex. A at 74-78); Meissner Depo. Ex. 6.

In many instances, a BJ's employee will simply provide information about BJ's renewal policy when asked about it, and the communication ends there. Atkinson Aff. ¶ 8; Douglas Aff. ¶ 5. In other instances, the members will either verbally agree and/or complete their renewal transaction after the policy is explained. Atkinson Aff. ¶ 9; Douglas Aff. ¶ 6. These types of interactions occur regularly both at in-store BJ's membership desks and in phone calls and emails to BJ's member care department. Atkinson Aff. ¶ 10; Douglas Aff. ¶ 7. And while BJ's member care department logs all member communications,[5] interactions at the BJ's membership desk are not recorded. Atkinson Aff. ¶ 11; Douglas Aff. ¶ 8; Bowles Depo. Tr. 92:1-18.

If a member is still not satisfied, membership desk personnel and member care specialists are given the discretion to offer to the member additional membership months free of charge.[6] Atkinson Aff. ¶ 12; Douglas Aff ¶ 10; Meissner Depo. Ex. 6. The myriad of reasons

_____

[5] Meissner Depo. Tr. 47:1-48:7.

[6] BJ's membership desk employees have the authority to extend membership by up to two months to address customer satisfaction concerns. Douglas Aff. ¶ 11; Atkinson Depo. Tr. 80:2-9; Bowles Depo. Tr. 80:1-6, 89:18-22. Likewise, BJ's member care specialists have the authority to extend membership by up to three months to address customer satisfaction issues. Meissner Depo. Tr. 66:14-16. Member care supervisors may extend membership by up to six months. *Id.* at 66:22-23. BJ's managers have the authority to grant up to a one-year extension to resolve member concerns. *Id.* at 66:24-25; Atkinson Depo. Tr. 80:2-5.

complimentary membership extensions are given range from merchandise- and club-related issues to a variety of membership-related issues, including BJ's membership renewal policy. Atkinson Depo. Tr. 119:10-13; 175:20-25; Bowles Depo. Tr. 102:9-15; Meissner Depo. Tr. 27:15-29:13.[7] BJ's encourages its membership desk personnel and member care specialists to use their judgment and discretion in responding to BJ's members' concerns on a case-by-case basis, with the primary goal being member satisfaction.[8] Atkinson Aff. ¶ 5; Douglas Aff. ¶ 11.

Records are kept for all complimentary membership extensions. For every in-store membership extension, a BJ's employee logs the extension on a "Customer Expiration Date Change Logs," reflecting the date of the change, the membership number, the current expiration date, the changed expiration date, and a brief explanation for the change. Atkinson Aff. ¶ 13; Douglas Aff. ¶ 14; Bowles Depo. Tr. 91:19-92:18. BJ's produced over 10,000 pages (containing numerous entries on every page) of these manual adjustment logs covering a period of several

---

[7] This evidence is not merely anecdotal. The membership and transaction data BJ's produced provides empirical evidence that negotiated membership extensions occurred in connection with more than 6% of all transactions that otherwise would have been subject to BJ's renewal policy in 2011. Peterson Aff. ¶ 10. While Cappalli claims that customer complaints regarding BJ's renewal policy "represent a very small fraction of the number of customers actually subject to it," Cappalli Memo. at 7, the document she relies on for support was never intended to provide a scientifically accurate count and did not, for example, reflect any of the many manual adjustments made at the membership desks of BJ's stores.

[8] The testimony of BJ's representatives when deposed by Cappalli's counsel was consistent on this point. As explained by Michael Atkinson, then BJ's Senior Vice President, Director of Marketing and e-Commerce, "We'll deal with exceptions based on satisfaction . . . . We will step out of the way to deal with exceptions." Atkinson Depo. Tr. 175:16-176:1; 143:16-18 ("On a case-by-case basis, we will always take care of our members' concerns."). Similarly, Karen Bowles, then BJ's Vice President of Membership and Sales, testified that "BJ's takes care of members on a members-first basis . . . the resolution on how we handle members is on a case-by-case basis based on individual judgment." Bowles Depo. Tr. 106:8-12. Joan Meissner, BJ's Member Care Services Manager, similarly explained that BJ's member care specialists do not rely solely on guidelines or manuals in responding to customer inquiries; rather, they "communicate based on what the customer requested or asked." Meissner Depo. Tr. 22:14-15.

months in 2010-2011.[9]  Renshaw Aff. ¶ 8.  Likewise, BJ's produced electronic records from its member care department showing that BJ's routinely addresses requests from BJ's members to adjust their expiration date for a variety of customer satisfaction reasons, including in connection with the renewal policy.  Meissner Depo. Tr. 27:15-29:13; Renshaw Aff. ¶ 7.  Each of these membership extension negotiations is unique to the specific BJ's member.

Importantly, whenever a member is granted a membership extension, both membership desk personnel and member care specialists are specifically instructed to inform the member that the extension is a "one-time exception."  Atkinson Aff. ¶ 14; Douglas Aff. ¶ 12; Atkinson Depo. Ex. 25 (Woodward Aff. Ex. A at 74-78); Meissner Depo. Ex. 6.  Thus, after the first extension of their expiration date, BJ's members are specifically on notice that subsequent renewals are subject to the renewal policy.

### D.  Cappalli Has Not Shown That Class-Wide Damages Can Be Proven Through Common Proof.

BJ's produced all data in its possession concerning the membership renewal history of each member contained in its membership database, and provided the *enrollment date*, *renewal date*, *membership expiration date*, and *previous expiration date* associated with the unique eleven-digit member number assigned to each member.  Burstall Aff. ¶ 2.  BJ's does not in the ordinary course of business need or retain historical data concerning these data fields; instead, those fields are updated and overwritten each time a customer renews.  Burstall Aff. ¶ 3; Peterson Aff. ¶ 4; Peterson Report ¶ 76.  BJ's also produced transaction data showing for each unique member number the date of each membership purchase, the amount paid, and the SKU

---

[9] As reflected in a representative sample of logs from the Coventry, Rhode Island store where Cappalli was a member, these logs show that changes to membership expiration dates are made every day for a variety of customer satisfaction reasons, including in connection with the renewal policy.  Douglas Aff. ¶ 15, Ex. A.

associated with the purchase (*i.e.*, inner circle, business, or supplemental membership).  Burstall

Aff. ¶ 4.  The transaction data available to BJ's and maintained in the ordinary course of business

only extended back as far as June 2005.  *Id.* ¶ 5.

Because the membership data only records the most recent renewal transaction for each

BJ's member, BJ's membership data generally do not allow determination of whether a member

was subject to reset or of the number of days of privileges a member received even following

June 2005.  Peterson Aff. ¶ 4; Peterson Report ¶¶ 76-78.  Cappalli's own purported expert,

Stanley Monsowitz, conceded that if data concerning the renewal histories of members is

overwritten at the time of each renewal, then this would "pose an obstacle" to identifying

renewing members and calculating the damages they suffered.  Monsowitz Depo. Tr. 149:1-11

(attached as Ex. F to the Renshaw Aff.).

Monsowitz has not attempted to use the data produced by BJ's showing the individual

transactions for the purchase of renewal memberships to determine whether, using some set of

reasonable assumptions, a determination of the expiration date assigned to a member at the time

of renewal could be made.  Peterson Aff. ¶ 5.  Although Monsowitz initially claimed that "BJ's

possesses complete renewal data for renewing members" so that "the economic loss [suffered by

BJ's members] can very easily be calculated," Renshaw Aff. Ex. G (Monsowitz Report at 3), he

had not verified whether his assumption was, in fact, correct (and it was not).  Monsowitz Depo.

Tr. 154:18-21 ("Q. Did you read [the] testimony [of relevant witnesses] to ensure that they

testified that BJ's possesses complete renewal data for renewing members?  A. No, I did not.").

In fact, BJ's has produced all data in its possession concerning the membership renewal history

of each member.  Burstall Aff. ¶ 2.

## III.   ARGUMENT

### A.   Cappalli Bears The Burden Of Proving That All Class Certification Prerequisites Are "In Fact" Met, And This Court Must Conduct A "Rigorous Analysis" Of That Proof.

As the party seeking class certification, Cappalli bears the burden of demonstrating that each of the prerequisites for class certification under Rule 23(a), and one of the several elements of Rule 23(b), have been satisfied. *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003). The Rule 23(a) elements are (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Because Cappalli seeks to certify a class under Rule 23(b)(3), she must also prove that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). And, while not explicitly mentioned in Rule 23, "[t]he existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of [Rule 23]." *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007). *See also Crosby v. Soc. Sec. Admin. of U.S.*, 796 F.2d 576, 580 (1st Cir. 1986).

Recognizing the consequences that flow from class certification,[10] the Supreme Court has repeatedly cautioned, "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01

---

[10] Certification of a class has several immediate and dramatic effects on the scope and stakes of a lawsuit: the number of parties, the resources (both financial and judicial) needed to resolve the case, and the defendant's potential liability all multiply by orders of magnitude. "[W]hen damages allegedly owed to tens of thousands of potential claimants are aggregated and decided at once, the risk of an error will often become unacceptable," and "faced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1752 (2011) (noting "the risk of 'in terrorem' settlements that class actions entail").

A/75387701.2

(1979)).   "[T]o justify a departure from that rule," Cappalli must prove, with admissible evidence, that every prerequisite for class certification is "in fact" met.  *Id.* at 2550-51 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." (emphasis in original)).  *See also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable.").[11]

In assessing whether Cappalli has carried her burden, this Court must "look beyond the pleadings" and conduct a "rigorous analysis" of the prerequisites.  *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 6 (1st Cir. 2005); *Smilow*, 323 F.3d at 38 (citing *Falcon*, 457 U.S. at 161). This "rigorous analysis" cannot be conducted in a vacuum, but must be undertaken in the context of "the probable course of litigation" and, in particular, how Cappalli will prove her case at trial. *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000) ("[A] district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.").  Failure to "grappl[e] in

---

[11]  For example, Cappalli fails to prove as a matter of fact that the proposed class meets the numerosity requirement.  Cappalli's only evidence of numerosity is an email identifying approximately 1.1 million membership renewals in 2006 that were for periods greater than nine months but less than one year.  *See* Cappalli Memo. at 16 & Ex. C (BJWC006955).   She introduces no evidence, however, to show how many of those members renewed more than 15 days after their prior memberships expired, how many did not assent to the membership renewal policy, how many were in states where their claims were time barred, etc.  This Court cannot simply assume that the numerosity requirement is met from this incomplete proof.  *See, e.g., Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267-68 (11th Cir. 2009) ("Yes, T-Mobile is a large company . . . and, as such, it might be tempting to assume that the number of retail sales associates the company employed in Florida during the relevant time period can overcome the generally low hurdle presented by Rule 23(a)(1).  However, a plaintiff still bears the burden of establishing every element of Rule 23 . . . and a district court's factual findings must find support in the evidence before it.").  *See also Makuc v. Am. Honda Motor Co., Inc.*, 835 F.2d 389, 394 (1st Cir. 1987); *Roberts v. Rhode Island*, 2000 WL 33671759, at *2 (D.R.I. 2000).

detail with the parties' contending proffers and arguments" and to "subject the parties' contentions to the plenary analysis that precedent requires" is reversible error.  *Gintis v. Bouchard Transp. Co., Inc.*, 596 F.3d 64, 65, 68 (1st Cir. 2010).

Tellingly, Cappalli has not submitted a trial plan with her motion, or otherwise explained how she thinks this matter will play out at trial.[12]  Cappalli's brief is silent as to how she intends to prove each element of her claims against BJ's on a class-wide basis.  Her failure to demonstrate that core issues like liability, affirmative defenses, and damages can be resolved on a class-wide basis precludes a finding that common issues of law and fact exist, let alone predominate in this litigation.  Similarly, she has not demonstrated any way to ascertain the members of the proposed class short of an individualized, case-by-case determination.  Her choice-of-law analysis is woefully incomplete.  Taken together, these failings demonstrate that a class action is not the superior method for resolving the putative class members' claims here.

**B.     *Dupler*, *Argento*, And *Held* Militate Against Class Certification In This Case.**

Cappalli argues that class certification is warranted because BJ's renewal reset policy is "essentially similar" to the policies challenged in *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29 (E.D.N.Y. 2008); *Argento v. Wal-Mart Stores, Inc.*, 66 A.D.3d 930 (N.Y. App. Div. 2009); and *Held v. AAA S. New England*, 2012 WL 4023367 (D. Conn. 2012), in which classes were

---

[12]  *See* Fed. R. Civ. P. 23 Advisory Committee Note (2003) ("A critical need is to determine how the case will be tried.  An increasing number of courts require a party requesting class certification to present a 'trial plan' that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof." (citing *Manual For Complex Litigation*, § 21.213, p. 44; § 30.11, p. 214; § 30.12, p. 215 (3d ed. 1990))); *Advanced Acupuncture Clinic, Inc. v. Allstate Ins. Co.*, 2008 WL 4056244, at *14 (D.N.J. 2008), *aff'd on other grounds*, 342 Fed. Appx. 809 (3d Cir. 2009) ("Plaintiffs have not suggested any blueprint for case management other than highlighting the possible common issues of law or fact.  Plaintiffs have failed to address how the Court could effectively manage this class, with thousands of potential plaintiffs, in states across the country.  There is no litigation plan that puts forth a proposal regarding the variations in state law and individualized issues, and how the Court can effectively and efficiently try the case.").

certified.  Cappalli Memo. at 1, 13-15.  Cappalli acknowledges, but fails to address, the critical distinction that defeats her argument:  "the contract claims in those cases were premised on standard form written contracts."  *Id*. at 15.  By contrast, this case concerns unique, oral and/or implied-in-fact contracts.

The contracts at issue in *Dupler*, *Argento*, and *Held* were accepted by all parties to be standardized/form, written contracts,[13] which is precisely why the classes in those cases could be certified.  *See Dupler*, 249 F.R.D. at 37 ("An overwhelming number of courts have held that claims arising out of form contracts are particularly appropriate for class action treatment."); *Held*, 2012 WL 4023367, at *4 (citing *Dupler*, 249 F.R.D. at 37).   Here, by contrast, the contracts at issue are neither uniform nor written; rather, according to Cappalli herself, these contracts are either oral or implied-in-fact contracts whose terms vary according to the words exchanged and the actions taken at the time each contract was negotiated, thus making them uniquely ill-suited for class treatment, as explained below.

## C.  Individual Inquiries Concerning Contract Formation And Assent To The Renewal Policy Defeat Commonality and Predominance.

Throughout this litigation Cappalli has argued repeatedly that the assented-to terms of the contract between her (and the members of the putative class) and BJ's are not defined by the P&Cs, renewal notices, receipts, or any other written forms.   Instead, she has continually maintained that any contractual relationship between the parties is best characterized as oral or implied-in-fact.  As previously noted by this Court, the existence and assented-to terms of such contracts are inferred from the parties' "words and actions . . . manifest[ing] the <u>objective</u> intent

---

[13]  *See, e.g.*, *Dupler*, 249 F.R.D. at 35, 37 ("It is undisputed that Costco utilizes a uniform 'Privileges and Conditions of Your Costco Membership' document . . . for all class members"; "the plaintiff has demonstrated that . . . all putative class members are bound by the same Privileges and Conditions of Membership").

to promise or be bound." SJ Order at 10 (emphasis in original) (quoting *Bourque v. FDIC*, 42 F.3d 704, 708 (1st Cir. 1994)). *See also Bielass v. New England Safe Sys., Inc.*, 617 F. Supp. 682, 684 (D. Mass. 1985) (terms of implied-in-fact contract can only be inferred from the "conduct of the parties . . . in the light of the circumstances"). Thus, whether an oral or implied-in-fact contract was formed, and on what terms, is necessarily a transaction- and member-specific inquiry, and resolving the class claims in this case would require evidence of the parties' conduct and the attendant circumstances for each individual membership renewal.

### 1.   Cappalli fails to establish a common question of law or fact.

Cappalli must first prove that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Supreme Court has recently cautioned that "any competently crafted class complaint literally raises common questions. For example: Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification." *Dukes*, 131 S. Ct. at 2551 (internal quotation marks and citation omitted). Rather, "[w]hat matters to class certification is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id*. (emphasis in original) (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Cappalli's set of purported common questions represents precisely the sort of superficial list of questions not susceptible to common answers which the Supreme Court in *Dukes* cautioned against. The sole common issues she cites are (1) BJ's renewal policy (which she characterizes as "systemic, and it affects Ms. Cappalli the same way it affects anyone else whose membership was backdated,"); (2) whether BJ's was unjustly enriched by the policy; and (3) whether BJ's breached its "implied contracts with all Class members." Cappalli Memo. at 17.

None of these questions can be answered in "one stroke." *Dukes*, 131 S. Ct. at 2551. There is simply no contract (whether oral, implied-in-fact, or written) common to Cappalli and each of the millions of other BJ's members of the proposed class under the laws of each of the 15 states in which BJ's operated over the 10-year class period.  Whether Cappalli or any other proposed class member assented to BJ's renewal policy is a question that, by definition, is not susceptible to common proof.  *See, e.g., Kreger v. Gen. Steel Corp.*, 2010 WL 2902773, at *18-19 (E.D. La. 2010) (denying certification of breach of implied contract claims because "[m]utual intent cannot be proven unilaterally.  Each party's intent is a necessary element. . . . [T]he breach of contract claims can only be proven by examining the communications made between [defendant] and each individual class member.").  Moreover, even if there were common issues of fact or law concerning the membership contracts themselves (and there are not), Cappalli also must show that she could prove through common proof that BJ's breached those contracts.  *See De Giovanni v. Jani-King Int'l, Inc.*, 262 F.R.D. 71, 77 (D. Mass. 2009) (denying class certification of breach of contract, misrepresentation, unjust enrichment, and quantum meruit claims because"[d]emonstrating that the terms of the contracts were the same for all class members accomplishes only half of the battle . . . . [P]laintiffs would also have to prove that Jani-King breached its Franchise Agreement with each franchisee.").

Courts consistently refuse to certify a class in claims for breach of implied contracts and unjust enrichment because there are no common questions of fact or law raised by those claims. For example, in *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256 (11th Cir. 2009), the court refused to certify a class of T-Mobile employees based on a former sales employee's claims of breach of contract and unjust enrichment for "unpaid wages," finding that the plaintiff had failed to establish "commonality . . . because he has not alleged in his complaint the existence of a

common contract under which T-Mobile employed all class members." 564 F.3d at 1272. The court held that "[w]ithout the existence of a common contract, of course, there can also be no commonality with respect to whether T-Mobile's conduct relating to commission charge backs, *even if undertaken pursuant to a uniform policy*, constituted a breach of every class member's particular employment contract, whether any such breach was material for every class member, or whether each class member suffered cognizable damages as a result." *Id*. (emphasis added). *See also Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 340 (4th Cir. 1998) (no commonality where contracts differed among class members); *Sprague v. Gen. Motors Corp*., 133 F.3d 388, 398 (6th Cir. 1998) (same).

> **2.     Cappalli fails to prove that common questions predominate as to the breach of contract claim.**

Even assuming that Cappalli had raised common questions that were susceptible to common answers (which she has not), those common questions would not "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The predominance criterion is far more demanding . . . than the commonality requirement," and "a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *In re New Motor Vehicle Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008). *See also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (Rule 23(b)(3) covers "situations in which class-action treatment is not as clearly called for," and thus requires the district court to take "a close look at the case before it is accepted as a class action") (internal quotation marks omitted). Here, the circumstances giving rise to each membership contract -- and the knowledge each member possessed when they renewed -- clearly predominate.

Breach of contract claims are inappropriate for class treatment "where the very terms of the contract are an open question." *Clausnitzer v. Fed. Express Corp.*, 248 F.R.D. 647, 658 (S.D. Fla. 2008).  *See also Vega*, 564 F.3d at 1274 (individual issues predominated for contract claims, where the understandings of the class members regarding the terms of the contract varied from member to member); *Ramirez v. DeCoster*, 194 F.R.D. 348, 355 (D. Me. 2000) ("Breach of contract claims are, by definition, fact-specific to each individual, for in each instance the trier of fact must determine whether there was a promise, a contract, and, if so, what its terms were and whether it was breached.").  For example, in *Abla v. Brinker Rest. Corp.*, 279 F.R.D. 51 (D. Mass. 2011), the district court held that individual questions predominated, and a class could not be certified, in a case involving breach of implied contract claims.  "Because there is no written contract, Plaintiffs will not only have to prove contract formation . . . they will also have to prove . . . that the terms of these implied contracts were the same as to all class members.  It is not possible or advantageous to attempt to prove liability for breach of implied contract on a class-wide basis, because the very existence of a contract . . . will be subject to individual proof and defense." 279 F.R.D. at 58.

This is particularly true where, as here, the contracts are not written but rather formed as implied-in-fact contracts or as a result of oral representations.  *See, e.g.,* 7 *Newberg on Class Actions* § 22:55 (4th ed. 2002) ("Examples when class certification was denied based on the predominance of questions of law or fact affecting only individual class members include situations where . . . the allegations are based on varying oral representations."); *McCracken v. Best Buy Stores, L.P.*, 248 F.R.D. 162, 163 (S.D.N.Y. 2008) ("Because it is clear that plaintiffs' claims rely on oral representations of individual sales clerks that do not lend themselves to 'generalized proof,' the motion for class certification is denied."); *Basco v. Wal-Mart Stores,*

A/75387701.2

*Inc.*, 216 F. Supp. 2d 592, 602 (E.D. La. 2002) (predominance of individual issues precluded certification of breach of oral contract claim since "it is possible that no two plaintiffs' allegations concerning formation or terms of their contract will be the same"); *Cohn v. Mass. Mut. Life Ins. Co.*, 189 F.R.D. 209, 215 (D. Conn. 1999) (individual issues predominated where the resolution of breach of contract claim depended on the written and oral representations made to each plaintiff).[14]

BJ's membership renewals are formed on an individualized, case-by-case basis, with no uniform approach whatsoever. What each renewing member understood their membership term to be, and whether an oral or implied-in-fact contract between the member and BJ's was formed, necessarily varies from transaction to transaction, and depends on many factors, including the manner in which the member renewed (*i.e.*, renewing at the membership desk; purchasing a renewal membership at the register at the time of check-out; returning one of two renewal forms mailed to members; logging onto the BJ's website and renewing online; or calling a customer service representative and renewing by phone); the documentation provided or made available to the member (*e.g.*, the P&Cs, renewal notices, receipts showing expiration dates); the representations made during any conversations or interactions between the member and BJ's membership personnel; and the members' prior experience with membership renewals.

---

[14]   The cases Cappalli cites in support of her contention that implied contracts are susceptible to class treatment are all distinguishable. *See Slapikas v. First Am. Title Ins. Co.*, 250 F.R.D. 232, 245 (W.D. Pa. 2008) (breach of implied contract claim premised on unambiguous standardized forms and procedures, not on representations made by agents); *Alberton v. Commw. Land Title Ins. Co.*, 247 F.R.D. 469, 480 (E.D. Pa. 2008), *overruled on other grounds by Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 225 n.15 (3d Cir. 2008) (same); *Salvas v. Wal-Mart Stores, Inc.*, 452 Mass. 337, 366 (2008) (where "all members of the class were unarguably the beneficiaries of identical terms of employment," express or implied contract could be subject to class claims). *Mick v. Level Propane Gases, Inc.*, 203 F.R.D. 324 (S.D. Ohio 2001), also cited by Cappalli, was an action for fraud and deceit, not breach of contract.

There are as many variations on these factors as there are BJ's members.  For example, some members renew without any interaction with BJ's personnel, such as online or by mail.  For those members, it is entirely unclear what their understandings are regarding the terms of their agreement with BJ's, given the potential inconsistency of those terms in the P&Cs:  as this Court previously found, the P&Cs accurately describe BJ's renewal policy but also state that membership was effective "for one year from enrollment."   SJ Order at 12.   This ambiguity was deemed sufficiently material to create a genuine issue of material fact and preclude summary judgment with respect to the terms of Cappalli's own agreement with BJ's even after years of discovery and multiple rounds of briefing.

How, then, would a court decide whether any given class member understood he/she was agreeing to the *renewal* provisions of the P&Cs, or to the *enrollment* provisions of the P&Cs?  Only by interviewing each class member and reviewing their relevant documents could a factfinder answer that question.  The complexity of the factfinding is further compounded when one considers how to treat members who renewed from mid-2008 through late 2010, during which the P&Cs were silent on the renewal policy.  The understandings of those members might well depend on whether they had joined during a period in which the P&Cs were more explicit, or a myriad of other factors.

Similarly, the terms of the agreements formed by those members who, like Cappalli, were given a range of information about BJ's policy yet made the "assumption" that the policy nonetheless provided them 12 months of membership from the date of their renewal must be determined on a case-by-case basis.[15]  Some of those members undoubtedly renewed at the

---

[15]  Cappalli states in conclusory fashion that she "is an adequate representative because she has no individual interests in this litigation that conflict with the best interests of the Class."  Cappalli Memo. at 19.  In fact, Cappalli continues to work (she characterizes herself as an

membership desk, and thus would have received renewal receipts showing a membership expiration date of less than one year from the date of renewal. Others may have received renewal notices with differing information about their membership expiration; others may have seen the P&Cs at the membership desk or online; others may have noticed their sales receipt showing a shorter expiration date than what they had believed existed; others may have overheard a friend or neighbor discussing the policy. And any one of those members could have received any combination of such information over the course of their membership: the list goes on, with infinite variations. With so many avenues of information available, parsing through the "objective manifestations" underlying each class member's assumptions as to the terms of their agreement with BJ's would be absolutely impossible for the putative class members.

Likewise, the understandings of those renewing members who had oral conversations with BJ's personnel about their renewal would be subject to as many variations on their understandings as there are variations in the conversations. Many of those members do in fact ask BJ's personnel about the policy. Those personnel are then instructed to explain the policy and to encourage the member to accept it. Should the member do so, that member cannot be included in the class, since they assented to BJ's renewal policy (or what they understood the policy to be) after explicitly being told about it. Yet there is no record of which members had such conversations, and therefore no way of knowing who they are without member-by-member interviews.

---

"independent contractor") for Mr. Wasylyk (Cappalli Depo. Tr. 13:11-15) -- who is also proposed as class counsel in this case -- raising serious questions about her adequacy as a class representative. *See, e.g., Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1374-75 (11th Cir. 1984) (holding that district court did not abuse discretion by denying class certification where named plaintiff was employee of class counsel); *London v. Walmart Stores, Inc.*, 340 F.3d 1246, 1255 (11th Cir. 2002) (friend and former stockbroker of class counsel held to be inadequate class representative due to conflict of interest).

A/75387701.2

Finally, there is a significant group of members who were granted complimentary extensions of their memberships after expressing dissatisfaction with the renewal policy. Those members, too, must be excluded from the class, since they have already been provided full relief for their complaint. Given the many different experiences members have when negotiating their membership renewals, and the fact that members do bargain for different renewal terms, Cappalli cannot possibly prove the requisite "meeting of the minds" based on the parties' "objective manifestations," on a class-wide basis.

### 3. Cappalli fails to prove that common questions predominate as to the unjust enrichment claim.

Cappalli's claim for "money had and received" (*i.e.*, unjust enrichment) fares no better. An essential element of that claim under Rhode Island law, as this Court noted, "is that the enrichment to the defendant be unjust." SJ Order at 29 (quoting *Ciampi v. Zuczek*, 598 F. Supp. 2d 257, 263 (D.R.I. 2009)). Whether a particular enrichment was "unjust" requires a court to "examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist . . . . Due to the necessity of this inquiry into the individualized equities attendant to each class member, courts . . . have found unjust enrichment claims inappropriate for class action treatment." *Vega*, 564 F.3d at 1274. *See also Abla*, 279 F.R.D. at 58 ("As with the claims for breach of implied contract, this inquiry requires an examination of the context of each transaction, and thus is not subject to class-wide proof.").

The cases Cappalli cites to the contrary are inapposite. *See In re Checking Account Overdraft Litig.*, 2012 WL 3265093, at *11 (S.D. Fla. 2012) (unjust enrichment claims could be certified because "[b]ased on the evidence presented, class-wide proof is available to show that Comerica deliberately concealed from all customers important information about its overdraft policy") (footnote and internal citation omitted); *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D.

A/75387701.2

418, 436 (S.D.N.Y. 2009) (common questions predominated unjust enrichment claim "because the injury alleged is identical in each instance:   non-disclosure of Best Buy's Anti-Price Matching Policy").   Cappalli's unjust enrichment claim is pled in the alternative, and is necessarily dependent on the outcome of the breach of contract claim raised in the context of the unique facts particular to each individual member; it requires that the factfinder first "determine that there was no meeting of the minds because the parties each attached different meanings to their manifestations," so that there was no contract formed between BJ's and each individual member.  SJ Order at 28.

> **D.    Individual Inquiries Concerning Affirmative Defenses Further Defeat Predominance.**

"[A]ffirmative defenses should be considered in making class certification decisions." *Mowbray*, 208 F.3d at 295.  Although not a *per se* bar to certification, "individual issues . . . in one or more affirmative defenses" may defeat certification where, as here, common questions do not "otherwise predominate[]."   *Smilow*, 323 F.3d at 39.  BJ's asserts a number of affirmative defenses to both the breach of contract and the unjust enrichment claims that, like the issue of liability, require individual inquiries concerning the parties' conduct and the attendant circumstances for each membership renewal. *See* BJ's Answer at 6 (Dkt. No. 22).  This Court has already suggested that at least one of these defenses -- the voluntary payment doctrine -- requires a "voluntary" payment made with "full knowledge" of the facts, which in turn depends on whether the member actually read the P&Cs or their store receipts.  *See* SJ Order at 19-21. The intensity of the fact-finding required to prove such "full knowledge" precludes class certification.

Cappalli's individual case is instructive.   At the close of discovery and after extensive briefing, BJ's argued that Cappalli's claims were barred by the voluntary payment doctrine

because she renewed her membership without complaint even after BJ's provided her with a membership renewal notice reflecting her new membership expiration date as landing on the anniversary of the expiration of her old membership expiration date, as well as printed receipts or other written records at the time of each renewal transaction showing when her new expiration date would be, and even after she consulted with counsel about her claims in this case.[16]  The Court was unable to resolve the issue on summary judgment because it found no evidence that Cappalli had actually read a description of the renewal policy or any of the receipts BJ's provided her, and thus "there is a genuine dispute of fact with respect to whether Cappalli knew that her renewal memberships would expire less than twelve months from the date of purchase." SJ Order at 21.[17]  Moreover, the record shows that BJ's routinely extends membership expiration dates when asked, but warns members that this is a "one time exception."  Members accept the extended membership on those terms; if they renew again and are subject to BJ's renewal policy,

---

[16]  Binding all of the absent class members to the terms of whatever agreements Cappalli reached with BJ's also raises serious issues of due process because her claims are not typical of the proposed class.  There is substantial evidence that Cappalli knew that her membership had expired in January of each year, and that she renewed with full knowledge of the facts.  During four of the five years Cappalli was a member, she renewed at the membership desk at the BJ's store in Coventry, Rhode Island.  This suggests that Cappalli knew in each instance when she entered the store that her membership had already expired, and that she went to the membership desk to renew before shopping; otherwise, she would have done her shopping, learned that her membership had expired, and renewed at the cash register when she paid for her other purchases.  Moreover, Cappalli received (and kept in her files) at least two receipts showing that her renewal memberships expired in January of the following year.  Absent class members should not be bound by the resolution of disputed issues of fact unique to Cappalli.  *See, e.g., Vega*, 564 F.3d at 1276 ("Without a common contract, it is impossible for Vega to bring a case typical of all other class members.").  *See also Broussard*, 155 F.3d at 340 (typicality not satisfied because "the differences between the [contracts] raise the distinct possibility that there was a breach of contract with some class members, but not with other class members.  In such a case, the plaintiffs cannot amalgamate multiple contract actions into one."); *Sprague*, 133 F.3d at 399 ("The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class.  That premise is not valid here.").

[17]  In so doing, the Court noted various different formulations of the doctrine articulated by courts in other jurisdictions.  *Id.* at 19-21.  These differences also preclude certification of a nationwide class.  *See* § III.F.3, *infra.*

they do so with "full knowledge" of the facts, and are barred from recovery under the voluntary payment doctrine.

As such, it is clear that few, if any, of the claims of class members could be resolved without conducting a full "mini-trial" on this issue alone. *See Vega*, 564 F.3d at 1274 ("Additionally, T-Mobile apparently would proffer individualized and varying evidence to defend against claims of individual class members by showing what they knew or should have known about the charge back procedures. . . . Accordingly, even after the resolution of any common issues generated by the compensation program, significant questions concerning ultimate liability would remain for many class members."). If the proposed class were certified, then BJ's would improperly be prevented from the opportunity of determining if this defense is applicable to Cappalli and to each other member of the purported class.

      **E.**      **Cappalli Has Not Attempted To Show That Class-Wide Damages Can Be Established Through Common Proof, Nor Has She Shown That The Members Of The Class Are Even Ascertainable.**

      **1.**      **Class-wide damages cannot be established through common proof.**

Cappalli also fails her burden of establishing damages on a class-wide basis using common proof. *See, e.g.*, *In re Canadian Exp.*, 522 F.3d at 28 ("The ability to calculate the aggregate amount of damages . . . does not absolve plaintiffs from the duty to prove each class member was harmed by the defendants' practice."). "The inquiry for a district court at the class certification stage is whether the plaintiffs have demonstrated by a preponderance of the evidence that they will be able to measure damages on a class-wide basis using common proof." *Behrend v. Comcast Corp.*, 655 F.3d 182, 204 (3d Cir. 2011), *cert. granted* 133 S. Ct. 24 (2012). Otherwise, the "Herculean task" of calculating individual damages "counsels against finding

predominance." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187 (3d Cir. 2001).[18]

Damages in this case are highly individualized; the Court even granted BJ's motion for summary judgment on three out of five of Cappalli's claims based on her annual renewal memberships because she "enjoyed the full benefits of her renewal membership through February 15." SJ Order at 16. Nevertheless, Cappalli does not even attempt to demonstrate that damages can be measured on a class-wide basis by common proof; the sum total of her argument consists of the statement that "any potential issues regarding the individual amounts of damages will not preclude class treatment . . . ." Cappalli Memo. at 23. Cappalli offers no evidence -- as she must -- that every single member of the class suffered any injury whatsoever, much less that damages can be established on a class-wide basis by common proof. This failure alone is sufficient for the Court to find that she has failed to carry her burden. *See Chudner v. Transunion Interactive, Inc.*, 2010 WL 5662966, at *1 n.1 (D. Del. 2010) (denying motion for class certification in part because "[p]laintiff has not even provided an affidavit of an expert opining as to the feasibility of calculating class-wide damages.").

In fact, the uncontroverted evidence in the record is to the contrary. Dr. Peterson has recited a litany of difficulties with the membership data; for example, the data only begins in June 2005, but Cappalli proposes a class dating back to October 1, 2000, Peterson Aff. ¶ 3; Peterson Report ¶ 75. Because the membership data only records the most recent renewal transaction for each BJ's member, BJ's membership data generally do not allow determination of

---

[18] *See also Broussard*, 155 F.3d at 342-43 (reversing class certification order given "inherently individualized" damages claims); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 326 (3d Cir. 2008). Where the issue of damages would "requir[e] separate mini-trial[s] . . . of individual claims," the "staggering problems of logistics thus created make the damage aspect of [the] case predominate, and render the case unmanageable as a class action." *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977) (footnotes and internal quotation marks omitted).

whether a member was subject to reset or of the number of days of privileges a member received even following June 2005.  Peterson Aff., ¶ 4; Peterson Report ¶¶ 76-78.

Cappalli's own purported expert concluded that these data gaps would "pose an obstacle" to identifying renewing members and calculating the damages they suffered.  Monsowitz Depo. Tr. 149:1-11.  Monsowitz has not attempted to use the data produced by BJ's showing the individual transactions for the purchase of renewal memberships to determine whether, using some set of reasonable assumptions, a determination of the expiration date assigned to a member at the time of renewal could be made.  Peterson Aff., ¶ 5.  In fact, Cappalli has not suggested *any* methodology for overcoming this "obstacle" -- using the BJ's transaction data or otherwise -- much less proven by a preponderance of the evidence that damages can be proven on a class-wide basis using common proof.

> ### 2.    Cappalli has not provided any means for identifying the actual members of the proposed class.

A related problem is Cappalli's failure to demonstrate that the identities of the proposed members of the class are even ascertainable.  An essential prerequisite of a class action is that the class be currently and readily ascertainable based on objective criteria.  *See John*, 501 F.3d at 445; *Crosby*, 796 F.2d at 580.  "The proposed class must be precisely defined and its members must be ascertainable through the application of stable and objective factors so that a court can decide . . . who will receive notice, who will share in any recovery, and who will be bound by the judgment."  *Van West v. Midland Nat'l Life Ins. Co.*, 199 F.R.D. 448, 451 (D.R.I. 2001) (internal quotation marks omitted) ("The ascertainability requirement is not satisfied when the class is defined simply as consisting of all persons who may have been injured by some generically described wrongful conduct allegedly engaged in by a defendant.").

Cappalli has not demonstrated any way to ascertain the members of the proposed class based on "stable and objective factors" using the available BJ's membership data. That data shows only the last purchase of a renewal membership for each member; otherwise, it contains the dates of purchase of prior renewal memberships, but does not show the expiration dates associated with those memberships. Without some "stable and objective factors" for assessing the BJ's membership data, the only way to establish whether a particular customer is a class member would be for individual members to offer evidence -- presumably by way of a receipt or other evidence of the expiration date associated with prior memberships -- that their "renewal memberships were deemed to expire less than twelve months from the date of purchase." Because Cappalli has not suggested any practical way of ascertaining the members of the proposed class, it should not be certified. *See, e.g.*, *Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 446 (E.D. Pa. 2000) ("[T]he practical issue of actually identifying class members is indeed problematic, as it presents serious administrative burdens that are incongruous with the efficiencies expected in a class action.").

### F.  Cappalli's Deficient Choice-Of-Law Analysis Is Yet Another Reason To Deny Class Certification.

This Court cannot find that common questions of law predominate without first determining which state's law applies to each class member's claim and then analyzing the variances among those laws. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822-23 (1985) (due process mandates an individualized choice-of-law analysis); *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1120 (8th Cir. 2005) (reversing class certification where "the district court did not conduct a thorough conflicts-of-law analysis with respect to each plaintiff class member before applying Minnesota law."). As the moving party, Cappalli "must creditably demonstrate, through an *extensive analysis* of state law variances, that class certification does not present insuperable

obstacles." *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986) (emphasis added) (internal quotation marks omitted). *See also Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 370 (4th Cir. 2004) ("The plaintiffs have the burden of showing that common questions of law predominate, and they cannot meet this burden when the various laws have not been identified and compared."); *Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 313 (5th Cir. 2000) ("The district court is required to know which law will apply before it makes its predominance determination . . . [and it cannot] discharge its duty [where] plaintiffs d[o] not supply adequate information on the policies of other interested states relevant to the choice of law.").

Cappalli's choice-of-law "analysis" entails nothing more than superficial comparisons of the *elements* of breach of contract and unjust enrichment actions, and a review of the differing legal effects of express and implied contracts, in the fifteen states where BJ's operates stores. *See* Cappalli Memo. at 23-25 & Exs. H-J; *CLN Props., Inc. v. Republic Servs., Inc.*, 688 F. Supp. 2d 892, 897 (D. Ariz. 2010) ("Plaintiffs' single-citation charts for simple principles of law do not obviate the need for choice of law in this case."). She does not bother to identify and address variations in relevant legal *doctrines*, nor does she explain why a uniform, ten-year class period is appropriate when far shorter statutes of limitations apply in thirteen of those fifteen states.[19]

---

[19] Cappalli (or her counsel and employer) may very well have chosen to bring this action in Rhode Island because of its generous ten year statute of limitations for breach of contract claims. The statutes of limitations in thirteen of the fifteen states in which BJ's does business (and where various oral and implied-in-fact contracts were formed by various objective manifestations) are far shorter, and vary in length by state. *See* Delaware, 10 Del. C. § 8106(a) (three years); Maryland, Md. Code Cts. & Jud. Proc. § 5-101 (three years); New Hampshire, N.H. Rev. Stat. § 508:4 (three years); North Carolina, N.C. Gen. Stat. § 1-52 (three years); Pennsylvania, 42 Pa. C.S.A. § 5525(8) (four years); Florida, Fla. Stat. § 95.11(2)(b) (five years); Virginia, Va. Code § 8.01-246(2) (five years); Connecticut, Conn. Gen. Stat. § 52-576 (six years); Georgia, Ga. Code § 9-3-24 (six years); Maine, 14 Me. Rev. Stat. § 752 (six years); Massachusetts, Mass. Gen. Laws c. 260, § 2 (six years); New Jersey, N.J. Stat. § 2A:14-1 (six years); New York, N.Y. C.P.L.R. § 213 (six years). Variations exist between the statutes of limitations for bringing unjust enrichment claims in these states, as well, and they are almost

In addressing potential variations in state law affecting her breach of contract claim, Cappalli glosses over the potentially fatal impact of the analysis necessary to determine whether the alleged breaches of the millions of member contracts were "material" under each state's law, or whether each state varies in its treatment of the admissibility of parol evidence. These legal distinctions among the 15 states defeat class certification. *See, e.g.*, *Marino v. Home Depot U.S.A., Inc.*, 245 F.R.D. 729, 734-736 (S.D. Fla. 2007) (denying class certification in light of need for individualized determinations as to materiality for every class member, and potential differences in parol evidence rule). While she contends that such differences represent only "minor variations" in the "common proof" of her contract claims, Cappalli Memo. at 24 n.8, she does not -- and cannot -- explain what "common proof" she intends to offer.

Cappalli also contends that courts "routinely" certify classes on unjust enrichment claims, and that the elements of such a claim are "virtually identical" among the states. Cappalli Memo. at 23. A review of the relevant decisions, however, shows that the overwhelming majority of courts to have considered the issue have denied multistate certification of unjust enrichment claims.[20] As one of those courts recognized: "unjust enrichment is a tricky type of claim that can

---

uniformly shorter than the statute of limitations provided by Rhode Island law; Cappalli has made no effort to identify these conflicting statutes of limitations, much less show how a single, ten-year class can accommodate them all.

[20] *See, e.g.*, *Casa Orlando Apts., Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185 (5th Cir. 2010); *True v. Conagra Foods, Inc.*, 2011 WL 176037 (W.D. Mo. 2011); *Barrus v. Dick's Sporting Goods, Inc.*, 732 F. Supp. 2d 243 (W.D.N.Y. 2010); *In re Aqua Dots Prods. Liab. Litig.*, 270 F.R.D. 377 (N.D. Ill. 2010); *Kottler v. Deutsche Bank AG*, 2010 WL 1221809 (S.D.N.Y. 2010); *Cruz v. Lawson Software, Inc.*, 2010 WL 890038 (D. Minn. 2010); *Tyler v. Alltel Corp.*, 265 F.R.D. 415 (E.D. Ark. 2010); *Pilgrim v. Universal Health Card, LLC*, 2010 WL 1254849 (N.D. Ohio 2010); *In re McDonald's French Fries Litig.*, 257 F.R.D. 669 (N.D. Ill. 2009); *Muehlbauer v. Gen. Motors Corp.*, 2009 WL 874511 (N.D. Ill. 2009); *Spencer v. Hartford Fin. Servs. Group, Inc.*, 256 F.R.D. 284 (D. Conn. 2009); *Thompson v. Bayer Corp.*, 2009 WL 362982 (E.D. Ark. 2009); *Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*, 254 F.R.D. 68 (E.D.N.C. 2008); *Siegel v. Shell Oil Co.*, 256 F.R.D. 580 (N.D. Ill. 2008), *aff'd*, 612 F.3d 932 (7th Cir. 2010); *Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. 607 (D. Kan. 2008); *Vulcan Golf,*

have varying interpretations even by courts within the same state, let alone among the fifty states."  *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 584 (N.D. Ill. 2008), *aff'd* 612 F.3d 932 (7th Cir. 2010) ("Some states do not specify the misconduct necessary to proceed, while others require that the misconduct include dishonesty or fraud. . . . Many states, but not all, permit an equitable defense of unclean hands.  Those states that permit [such] a defense . . . vary significantly in the requirements necessary to establish the defense.").  Cappalli neither acknowledges nor analyzes even an iota of this variation.

Finally, Cappalli fails to address the many variances among state laws with respect to the voluntary payment doctrine defense.  These differences include, for example:

- Several states, including Georgia, Massachusetts, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, and Virginia, examine not only whether the plaintiff had "full knowledge of the facts" surrounding the payment, but also whether the plaintiff was defrauded or coerced into making the payment -- both highly individualized, fact-intensive inquiries.

- Connecticut requires that the plaintiff, in addition to having full knowledge of the facts, exhibit "a lack of diligence in determining his contractual rights and obligations" -- another highly fact-specific criterion.

- Florida and Maryland consider not just the circumstances surrounding the payment, but also the reason for the payment:  if the obligation at issue is unenforceable or excused under the contract, then Florida bars application of the doctrine; in Maryland, the doctrine does not apply if a right to recover the payment is provided for by statute.

- New York, in an effort to "remove[] technical objections in instances where recoveries can otherwise be justified by analogy with mistakes of fact," has curtailed the doctrine by legislating that "relief shall not be denied merely because the mistake is one of law rather than one of fact."

*See* Renshaw Aff. ¶ 12, <u>Ex. H</u> (charting the legal standard for the voluntary payment doctrine in the fifteen states included in Cappalli's choice-of-law analysis).

Cappalli's woefully deficient analysis precludes this Court from finding that common questions of law predominate in this case.  It is not the job of BJ's or this Court to do Cappalli's

---

*LLC v. Google Inc.*, 254 F.R.D. 521, 532-33 (N.D. Ill. 2008); *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483 (S.D. Ill. 1999).

homework for her; *she* must identify those differences, and *she* must convince this Court that such variations *in fact* pose no obstacle to class certification.  She has not carried that burden, and this Court should deny her motion for class certification for that reason alone.

### G.   Cappalli Fails To Prove That A Class Action Is The Best Method Of Adjudicating This Controversy.

Finally, a class action here is simply not "superior to other available methods for fairly and efficiently adjudicating the controversy" as required under Fed. R. Civ. P. 23(b)(3).  It is not enough for Cappalli to demonstrate that it may be possible for this Court to administer a nationwide class action; as the term "superior" implies, she must prove that a nationwide class action is the *best* method for resolving the class claims when compared to other alternatives such as *statewide* class actions or multiple, individual actions.  *See Gregory v. Finova Capital Corp.*, 442 F.3d 188, 190 n.3 (4th Cir. 2006) ("As long as the class action is not superior to one method, it makes no difference whatsoever that the class action is superior to other methods.").  Cappalli cannot make even the former showing, let alone the latter.

As discussed above, Cappalli possesses knowledge about the contracts between BJ's and one person only -- herself.  Cappalli has not identified any common questions of law or fact that are common to the class.  Rather, whether a particular member has assented to BJ's renewal policy is a highly individualized question of fact relating to an oral or implied-in-fact contract, and can only be resolved by looking at the particular circumstances giving rise to each contract. Whether a member knew about the BJ's renewal policy, and renewed with "full knowledge of the facts," so that their claims are barred by the voluntary payment doctrine, is another highly individualized question of fact.   These factual questions plainly predominate over any supposedly common question of law or fact.  Cappalli also has not identified any common proof by which damages can be established on a class-wide basis; for that matter, she has not even

shown that members of the class are ascertainable.  Finally, Cappalli has not shown any way that the Court can efficiently resolve questions of fact and law under the law of the fifteen states where BJ's does business.

Given the need for individualized proof in order to resolve liability, affirmative defenses, and damages, there appears to be no solution other than to conduct millions of "mini-trials" to determine whether any given BJ's customer can be a member of the class.  Cappalli's approach is not superior, and therefore the proposed class should not be certified.  *See Vega*, 564 F.3d at 1278 ("[A]ny trial of this case would require the presentation of a substantial amount of evidence specific to each of an unknown number of class members."); *Mattoon v. City of Pittsfield*, 128 F.R.D. 17, 21 (D. Mass. 1989) (class could not be certified, where it "would degenerate into a series of mini-trials before liability could be established." (quoting *Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671, 679 (5th Cir. 1982)).

## IV.  CONCLUSION

For all of the foregoing reasons, this Court should deny Cappalli's Motion for Class Certification.

Dated:  February 12, 2013

Respectfully submitted,

**BJ'S WHOLESALE CLUB, INC.,**

By its attorneys,

*/s/ Carol E. Head*
Carol E. Head (#6501)
carol.head@bingham.com
**BINGHAM MCCUTCHEN LLP**
One Federal Street
Boston, MA  02110-1726
Tel. (617) 951-8000
Fax (617) 951-8736

Beth I. Z. Boland, *admitted pro hac vice*
beth.boland@bingham.com
Brandon L. Bigelow, *admitted pro hac vice*
brandon.bigelow@bingham.com
Emily E. Renshaw, *admitted pro hac vice*
emily.renshaw@bingham.com
**BINGHAM MCCUTCHEN LLP**
One Federal Street
Boston, MA  02110-1726
Tel. (617) 951-8000
Fax (617) 951-8736

*Counsel for Defendant, BJ's Wholesale Club, Inc.*

A/75387701.2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) has been filed electronically and is available for viewing and downloading from the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants on February 12, 2013.


*/s/ Carol E. Head*
Carol E. Head
carol.head@bingham.com

A/75387701.2